ATTORNEY GENERAL *vs.* OLD COLONY RAILROAD COMPANY.

ATTORNEY GENERAL *vs.* BOSTON AND ALBANY RAILROAD COMPANY.

Suffolk.   May 22, 23, 1893. — November 3, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Statute — Informations in Equity — Mandamus — Commerce between the States — Constitutional Law — Obligation of Contracts — Delegation of Legislative Power — Compensation in Case of taking Property for a Public Use.*

It concerns the public, or an indefinite portion of the public, whether railroad corporations not exempted by the railroad commissioners from the provisions of St. 1892, c. 389, shall obey the statute, and therefore the Attorney General, as representing the public, may bring a petition in behalf of the Commonwealth for a writ of mandamus.

It is not a sufficient objection to St. 1892, c. 389, that it may incidentally affect commerce between the States, if it does not attempt to regulate such commerce.

The constitutionality of St. 1892, c. 389, requiring railroads to provide mileage tickets good upon all railroads in the Commonwealth, cannot depend upon the solvency or insolvency of any particular railroad company at any particular time.

When a railroad voluntarily unites with other railroads, and there are special provisions concerning tolls in some of the charters, and none in others, and the union is effected under a statute which provides that the corporation thus formed shall be subject to all general laws then or thereafter in force relating to railroad corporations, whether these special provisions continue in force and are applicable to the consolidated corporation, *quære.*

The St. 1892, c. 389, requiring railroads to provide mileage tickets good upon all railroads in the Commonwealth, is not in violation of Art. I., § 10, of the Constitution of the United States providing that "no State shall . . . make anything but gold and silver coin a tender in payment of debts."

The St. 1892, c. 389, requiring railroads to provide mileage tickets good upon all railroads in the Commonwealth, and authorizing the railroad commissioners to exempt or exclude any railroad therefrom "if in their judgment the public welfare or the financial condition of the road require or demand it," is not unconstitutional on the ground that it contains a delegation of legislative power to the board of railroad commissioners.

When property is taken for a public use and is consumed in the use, the provision for adequate compensation ought to be more than a mere right of action against a private person or corporation with the risk of never obtaining satisfaction, and the compensation when made must be made in money.

A statute which authorizes one railroad to determine the conditions on which another railroad must carry passengers, and compels one railroad to carry passengers on the credit of another, is unconstitutional. By FIELD, C. J., ALLEN & MORTON, JJ. HOLMES & KNOWLTON, JJ. dissenting.

If it be assumed that, under the power to regulate the fares of common carriers of passengers, the Legislature can require the passengers to be carried before the fares have been actually paid in money, the security for the ultimate payment of the fares in money ought to be as certain as that required when private property is taken for public uses, and a statute which does not provide adequate security is unconstitutional. HOLMES & KNOWLTON, JJ. dissenting on this construction of the statute.

Without denying the power of the Legislature to determine the form of the contracts which common carriers of persons or merchandise must make concerning transportation, and without considering the authority of the Legislature to delegate this power to a board of public officers, it was *held* by FIELD, C. J., ALLEN & MORTON, JJ., that this power cannot be delegated to private persons or corporations. HOLMES & KNOWLTON, JJ. dissenting on this construction of the statute.

The St. 1892, c. 389, required every railroad corporation in the Commonwealth to have on sale certain tickets which should be received for fare on all railroad lines in the Commonwealth, as well and under like conditions as upon the line or lines of the corporation issuing the same, and they were to be redeemed by each corporation issuing them upon presentation by any other corporation. The railroad commissioners were authorized in their discretion, on petition, to exclude any railroad from the provisions of the act. *Held,* by FIELD, C. J., ALLEN & MORTON, JJ., that the statute required a railroad company to transport passengers and receive therefor tickets which merely gave separate causes of action against another railroad company, and provided no security

that they would be redeemed in money by the railroad issuing them when presented for redemption although they might be used for transportation long after they were issued; that the company issuing tickets might impose upon other railroads duties in the carriage of passengers different from those it assumed towards passengers who purchased tickets of itself, and the tickets might be used indiscriminately upon all railroads within the Commonwealth not excluded from the statute, and were not confined to railroads engaged in transporting passengers in connection with the company issuing the tickets; that the railroad commissioners might exercise their power of exclusion in season to prevent loss from a failure of the company to redeem the tickets issued, or they might not; that the rights of railroad companies ultimately to receive in money the fares of passengers ought not to depend upon the discretion of the railroad commissioners, and if the statute would be invalid but for this discretion, this provision would not make it valid ; and that the statute was void.  LATHROP & BARKER, JJ. agreed that the informations were rightly brought by the Attorney General, that the court had jurisdiction, and that the necessary effect of the statute was to apply and appropriate individual property to the public use without the owner's consent, and without legal provision for reasonable compensation; and that the statute was void.  HOLMES & KNOWLTON, JJ. dissenting.

TWO APPLICATIONS for a writ of mandamus to the Old Colony Railroad Company and the Boston and Albany Railroad Company, praying that the defendants be required to provide and sell mileage tickets conformably to the provisions of St. 1892, c. 389, to all persons applying therefor, and to redeem all such tickets, or any part thereof, on presentation by any other railroad corporation, and to accept and receive from all persons for fare and passage upon all their own lines all such tickets issued by any other railroad corporation operating within the Commonwealth, and in all particulars to comply with the requirements of the law as therein set forth.*

---

* St. 1892, c. 389, is as follows : —

"Section 1.   Every railroad corporation operating within this Commonwealth shall provide and have on sale, for twenty dollars, mileage tickets representing one thousand miles, which shall be accepted and received for fare and passage upon all railroad lines in this Commonwealth, as well and under like conditions as upon the line or lines of the corporation issuing such ticket.

"Section 2.   Such tickets, or any part thereof shall be redeemed by each corporation issuing the same, upon presentation by any other railroad corporation.

"Section 3.   On petition of any railroad corporation included within the provisions of this act, filed with the railroad commissioners, asking that it may be exempt, or that any other railroad be excluded from the provisions of this act, said commissioners may in their discretion exempt or exclude such railroad from the provisions of this act, if in their judgment the public welfare or the financial condition of the road require or demand it."

Both applications were in the form of informations by the Attorney General. They were identical in form, that against the Boston and Albany Railroad Company being as follows:

"Albert E. Pillsbury, Attorney General, in behalf of the Commonwealth, informs the court that the Boston and Albany Railroad Company is a railroad corporation established under the laws of the Commonwealth and operating a railroad therein; and that it is required by a law of the Commonwealth, being chapter 389 of the acts of the year 1892, to provide and have on sale for twenty dollars, and to sell to all persons applying therefor, mileage tickets for passenger transportation representing one thousand miles; and to redeem all such tickets, or any part thereof, upon presentation by any other railroad corporation; and to accept and receive from all persons for fare and passage over its own lines all such tickets issued by any other railroad corporation operating within the Commonwealth, as therein prescribed.

"The defendant, though duly demanded, wilfully and wrongfully neglects and refuses to comply in any particular with the requirements of the law as hereinabove set forth, which wilful and wrongful neglect and refusal have continued from the taking effect of the law until the present time, and declares its purpose and determination not to comply therewith; which conduct is a violation of the law, and of the public right thereunder, for which there is no adequate remedy except by this proceeding.

"Wherefore the informant prays that the defendant be required and compelled, by writ of mandamus or other appropriate process, to provide and sell such mileage tickets to all persons applying therefor, and to redeem all such tickets or any part thereof on presentation by any other railroad corporation, and to accept and receive from all persons for fare and passage upon all its own lines all such tickets issued by any other railroad corporation operating within the Commonwealth, and in all particulars to comply with the requirements of the law as therein set forth; and for such other orders in the premises as justice may require."

Hearing before *Lathrop,* J., who in the first case excluded evidence offered by the defendant tending to prove the allegation of fact in the third, seventh, and eighth paragraphs of its

answer, and, the other allegations of fact in the answer being admitted, reserved and reported the case upon the information and answer, and the offer of evidence and ruling thereon for the consideration of the full court. The facts appear in the opinion.

The justice reported the second case for the consideration of the full court, upon the information, answer, and agreed facts, the material portions of which appear in the opinion.

The case was argued at the bar in May, 1893, and afterwards was submitted on the briefs to all the judges.

*A. E. Pillsbury,* Attorney General, for the Commonwealth. This statute is constitutional, either (1) as a regulation of the public business in which the defendants are engaged under a public franchise, by virtue of Pub. Sts. c. 112, § 180, or in the exercise of the general powers of the Legislature; or (2) as a condition imposed upon the further exercise of the franchise, which is subject to amendment or repeal at the will of the Legislature under the reservation of Pub. Sts. c. 105, § 3, originally St. 1830, c. 81; or (3) as an amendment of the charter under this reserved power. The power of the Legislature to regulate railroad tariffs within reasonable limits is settled. Pub. Sts. c. 112, § 180. *Boston & Worcester Railroad* v. *Western Railroad,* 14 Gray, 253. *Parker* v. *Metropolitan Railroad,* 109 Mass. 506. And as to the general extent of the reserved power of our Legislature over such corporations, see *Railroad Co.* v. *Fuller,* 17 Wall. 560; *Munn* v. *Illinois,* 94 U. S. 113 *et seq.; Stone* v. *Farmers' Loan & Trust Co.* 116 U. S. 307, and cases cited; *Dow* v. *Beidelman,* 125 U. S. 680; *Chicago & Grand Trunk Railway* v. *Wellman,* 143 U. S. 339, and cases cited; *Budd* v. *New York,* 143 U. S. 517; Cooley, Const. Lim. 736, note 3; *People* v. *Boston & Albany Railroad,* 70 N. Y. 569. The only limitation upon the power is that it shall not require service without reward, or amount to the taking or destruction of property without compensation, or without due process of law. *Georgia Railroad & Banking Co.* v. *Smith,* 128 U. S. 174, and cases cited. The act provides a sufficient compensation for the defendant for all transportation which it performs on tickets of other roads, by furnishing it on the spot with a voucher for the service and laying upon the issuing road the obligation to redeem it in money at sight, and giving the defendants, as it doubtless does, a right of action for the money if not paid; and this is enough. The statute

need not put the money into the defendants' hands. Even in the taking of property by eminent domain, the Legislature need not go so far as that. *Fitchburg Railroad* v. *Grand Junction Railroad*, 4 Allen, 198, 205. *Metropolitan Railroad* v. *Quincy Railroad*, 12 Allen, 262. *Boston & Worcester Railroad* v. *Western Railroad*, 14 Gray, 253. *Lexington & West Cambridge Railroad* v. *Fitchburg Railroad*, 14 Gray, 266. *Mayor, &c. of Worcester* v. *Norwich & Worcester Railroad*, 109 Mass. 103. *Metropolitan Railroad* v. *Highland Street Railway*, 118 Mass. 290. *Worcester & Nashua Railroad* v. *Railroad Commissioners*, 118 Mass. 561, 568. *Cambridge Railroad* v. *Charles River Street Railway*, 139 Mass. 454.

The only question presented by this objection, if any, is of the reasonableness of the requirement. The court may consider, (1) that the act lays upon the road issuing the ticket the legal obligation to redeem it in cash at its original value immediately upon presentation, from which a right of action for the value results to the defendant; (2) that the tickets can be presented as fast as taken up, so that the obligation cannot accrue for any length of time, except by the defendants' neglect; and (3) that § 3 of the statute provides a remedy for this supposed difficulty, by putting it into the power of the defendants to have any road which fails to redeem its tickets excluded forthwith from the operation of the act. Under these circumstances, it cannot be said that the requirement is so unreasonable as to be void upon its face, and unless it is so it must stand. The act does not unduly impair or affect the defendants' liberty of contract. The contracts of one railroad with another, and the contracts of a railroad with its patrons, are wholly within the control of the Legislature, subject only to the general limitation above stated. There is no interference with the defendants' right to acquire, possess, and protect property. The right of a railroad corporation under our laws to acquire and enjoy property is wholly within the control of the Legislature, subject only to the qualification that its property once acquired shall not be taken from it or destroyed without compensation. This act does not amount to a taking or destruction of the defendants' property. And even as to this, the Legislature has a larger power over this artificial creature of its own than over the private citizen. Cooley, Const. Lim. 646, 647, and cases cited in note. *Callender* v. *Marsh*, 1 Pick. 418, 430. *Fitchburg Railroad* v. *Grand Junction*

*Railroad*, 4 Allen, 198, 205.  *Commonwealth* v. *Eastern Railroad*, 103 Mass. 254.  *Cambridge* v. *Railroad Commissioners*, 153 Mass. 161, 169, and cases cited.

The statute is not in conflict with the legal tender clause of the Constitution of the United States.  This clause is a prohibition upon the States against issuing or authoizing a legal tender paper currency.  This act does not attempt, and has no effect to establish a legal tender currency.  Story, Const. §§ 1354–1372.  1 Elliot's Debates, Fed. Const. 270, 271.  5 Elliot's Debates, Fed. Const. 131, 381, 484, 561.  *Ogden* v. *Saunders*, 12 Wheat. 213, 266.  *Briscoe* v. *Bank of Kentucky*, 11 Pet. 257, 311.  *Darrington* v. *Bank of Alabama*, 13 How. 12.  *Virginia Coupon Cases*, 114 U. S. 269, 283.

The ticket of another road which the defendants are required to receive from a passenger does not pay for his transportation, and is not made or intended by the act to be in payment for it.  It is a mere evidence of the right to the payment which the passenger has already made, and which the defendant is entitled to receive in money from the road issuing the ticket.  The Legislature has often required railroad corporations to do various things upon the faith of a right of action against some other corporation for the cost or expense incurred.  Pub. Sts. c. 112, §§ 183, 188–193, 216–219 ; c. 113, §§ 46, 47.  If it has power to require railroads to carry passengers and look to another railroad for compensation, with only a right of action for it if not paid, it certainly has power to require them to do the same thing upon receipt of a ticket which is a voucher for and evidence of the right to the payment and to an action for it.  The fact that this statute gives the railroad the ticket in hand on the spot, at the time when the service is performed, does not invalidate the statute, nor make it obnoxious to the legal tender clause, if it could require the service to be performed without the ticket, and with only a right of action for the service.

The act does not amount to a deprivation of property without due process of law.  *Munn* v. *Illinois*, 94 U. S. 113.  *Davidson* v. *New Orleans*, 96 U. S. 97, 104.  *Stone* v. *Farmers' Loan & Trust Co.* 116 U. S. 307, 335.  *Dow* v. *Beidelman*, 125 U. S. 680.  *Minneapolis & St. Louis Railway* v. *Beckwith*, 129 U. S. 26, and cases cited.  *Budd* v. *New York*, 143 U. S. 517.

The objection that the mileage tickets of the various roads

now in force materially differ in their respective terms, conditions, and provisions can have no weight except upon the theory that the statute applies to the tickets now in use ; but such is not the necessary or perhaps the correct construction of the statute, which may be held to contemplate and to require the issue of one uniform ticket.

Assuming, as most favorable to the defendants, that the words " under like conditions " give to a passenger riding on any road upon a ticket issued by another road the highest rights which he would have on the road issuing the ticket, it cannot be said that the necessary effect of this is to allow one road to make a contract to bind another road, or that it imposes on any road the burden of a contract made by another road.   The obligation laid upon the road on which the passenger rides, in the case supposed, is not to be regarded as a contract obligation, but as a legislative regulation imposed on the road on which the passenger rides by force of the statute.   The effect of this provision of the statute may, and in favor of constitutionality should, be taken to be that the Legislature imposes on each road, as a regulation and condition of its own operation, that passengers travelling thereon on the mileage tickets shall be allowed the rights given them by the tickets by whomsoever issued, adopting as it were the conditions of the ticket as legislative regulations.   In doing this the Legislature must be regarded as proceeding upon the reasonable assumption that no road will voluntarily contract to furnish its own patrons with anything which it would be unreasonable in law to require other roads to furnish their patrons.   The question, therefore, is only of the reasonableness of such a regulation as an exercise of legislative power, and the court will not presume that it will operate so unreasonably as to be beyond the power of the Legislature.

That the act makes the defendants liable for transportation performed by other railroads on their own roads, or on roads which the defendants do not operate or control, is true only in form, if at all.   The passenger has paid the defendant railroad in advance for the ticket, and the requirement is only that the defendant railroad shall turn over to the carrying road such part of the purchase price of the ticket as it has earned by carrying the passenger, this portion of the ticket being extinguished by the transaction.   It amounts to this, that if the defendant rail-

road sells and takes pay for a ticket good on another road, which is in fact used on that road, that road, and not the defendant road, shall have the price of it.

*Samuel Hoar*, for the Boston and Albany Railroad Company. This act is unconstitutional under the Constitution of Massachusetts:

Because it interferes with the right of the defendants, which they hold in common with all persons, to make reasonable and proper contracts in carrying on their business, and so interferes with their right to acquire, protect, and possess property.

Because it appropriates the defendants' property without providing a reasonable compensation. First, in depriving them of their right to contract without giving any compensation, secondly, in taking away without compensation their right to enter into competition with other roads, and thirdly, in compelling them to sell their commodity — to wit, the carriage of passengers — for a compensation which is not a reasonable one according to law.

Because it does not apply generally even to the class of persons known as railroad corporations, since it provides that certain corporations may be exempt from its provisions.

And that the power to alter and amend does not permit the Legislature to infringe upon either of these three rights to this extent, because they are rights which the defendants as corporations are entitled to, just as a natural person is entitled to them, by force of their existence; and such provisions as this statute contains are inconsistent, with the purposes for which railroad corporations exist.

This statute is unconstitutional under the Federal Constitution:

Because it seeks to regulate commerce over the defendants' roads outside of the State lines, and also interferes with interstate commerce within the State lines.

Because it makes the coupon of the mileage ticket a tender in payment of the debt arising from a passenger to the carrier, in violation of the provision forbidding a State to make anything but gold and silver coin a tender in payment of debts.

Because it infringes the constitutional provision against impairing the obligation of contracts, since the State, by the charter, has contracted that the railroad company shall, during its existence, have the same rights as a natural person would have in the business which it is chartered to carry on.

Because it infringes the constitutional provision contained in the Fourteenth Amendment, that no State shall deprive a person of his property without due process of law, or shall deprive him of the equal protection of the laws.

And the defendants insist upon the paramount power of the limitations upon State legislation contained in the Federal Constitution, both over the right to amend or repeal charters and over the police power.

*J. H. Benton, Jr.*, for the Old Colony Railroad Company. 1. Upon the facts shown in this case, the act is invalid as a regulation of interstate commerce.

The act is a regulation of the rates for passenger transportation and a regulation of the conduct of passenger transportation on the defendants' roads, and although by its terms it purports only to regulate such rates and conduct within this State, it does substantially affect the rates for and the conduct of the interstate transportation on the same lines. While it purports only to control the carrier when engaged in transportation by rail within the State, it is obvious, and it is conceded under the offer of proof, that it substantially influences its conduct in the management of its business between the States.

In *Hall* v. *De Cuir*, 95 U. S. 485, an act of the State of Louisiana requiring all common carriers " within this State " to give all persons equal rights and privileges in all parts of the conveyance in which they were carried was held to be a regulation of interstate commerce, as applied to a steamboat making a voyage from New Orleans to Vicksburg, because it took away from the owner of the steamboat the power to adopt such reasonable rules and regulations for the disposition of passengers upon his boat, while pursuing its voyage within Louisiana, as seemed to him proper.

This case was decided in 1877, before the enactment of the interstate commerce law, but it was held that the fact that Congress had power to act upon the subject was exclusive of the power of States to act thereon, and that the non-action of Congress was equivalent to a declaration that the States should not act.

In the subsequent case of *Wabash, St. Louis, & Pacific Railway* v. *Illinois*, 118 U. S. 557, decided in 1886, it was held that a statute of Illinois, which attempted to regulate fares and charges by railroad companies within the limits of that State

for transportation which constituted a part of the commerce between the States was invalid, although Congress had not passed any act upon the subject, because, although the act by its terms applied only to transportation in the State of Illinois, it necessarily affected transportation between that State and another State.

In the case at bar it is conceded that the requirements of the act "substantially affect the rates for and the conduct of said interstate transportation." If a State law which does this is valid, then a State law which absolutely prevents a State road from engaging in interstate commerce is valid. The power to substantially affect the rates of interstate transportation, or the conduct of interstate transportation, is, like the power to tax, the power to destroy. It is immaterial whether the effect of the State law is upon one continuous act of interstate transportation, as in the Wabash case, or is upon all the acts of interstate transportation, as is conceded to be the case here. A State law, the requirements of which substantially affect the rate upon and the conduct of interstate transportation is an interference with that transportation and invalid. It should be observed in considering the Wabash case that, while three justices dissented, the dissent was solely upon the ground that Congress had not at that time passed any law regulating interstate commerce. Since then Congress has acted upon the subject, and therefore the opinion in the Wabash case, as applied to the state of affairs which exists to-day in regard to interstate commerce, is to be taken to be the opinion of the whole court.

In the Wabash case, *Hall* v. *De Cuir* was cited and approved. Subsequently, in *Louisville, New Orleans, & Texas Railway* v. *Mississippi*, 133 U. S. 587, a statute of Mississippi which required all railroads to provide separate accommodations for white and colored passengers was held valid, and distinguished from the statute in *Hall* v. *De Cuir* upon the ground that the Mississippi statute had been construed by the Supreme Court of that State to apply only to cars run within the State, and therefore not to affect interstate transportation, and because there was no proof that the requirements of the statute did affect interstate transportation; but Justices Harlan and Brewer dissented upon the ground that the Mississippi statute was a regulation which affected interstate commerce.

There is no case where a State statute, the requirements of which substantially affect the rates upon and the conduct of interstate transportation over the same line, has been sustained. The question is always whether the requirements of the State statute affect interstate commerce only incidentally and remotely, in which case the statute is valid, or whether they substantially affect interstate commerce, in which case it is invalid. *Smith* v. *Alabama,* 124 U. S. 465. *Nashville, Chattanooga, & St. Louis Railway* v. *Alabama,* 128 U. S. 96. *Ficklen* v. *Shelby County,* 145 U. S. 1.

2. The statute does not provide at what price these tickets shall be sold. A pecuniarily irresponsible road, as it is conceded some roads in Massachusetts are, could issue these tickets at a reduced price for the purpose of obtaining money, and then wait for presentation and pay them if it could, and, if not, let them stand like other unpaid claims, to be adjusted in bankruptcy or under a receivership. Indeed, under the law, if one of these pecuniarily irresponsible railroad companies should issue these tickets at any price that it saw fit, (and if they were issued at a reduced price they would be largely purchased,) then even after the failure of that road, when it was in the hands of a receiver, or was in bankruptcy, (as one road in Massachusetts has been under the United States Bankrupt Act,) the other companies would be compelled to take those tickets for transportation over their lines. The law is imperative. It requires all railroad companies to transport passengers, i. e. to give their property, (for transportation is all the property transportation companies have which they can sell or dispose of,) for the obligations of other persons, and the requirement does not depend upon whether those obligations are performed or not.

3. The act impairs the obligation of the contract as to fares and tolls contained in the charters of the Old Colony Railroad, and of the Boston and Providence Railroad corporation, and is therefore in conflict with the Constitution of the United States. The charters of these railroads each contained a specific grant of the right to take tolls at rates fixed by its directors, and each contained a specific agreement that the tolls thus fixed should not be reduced without the consent of the corporation so as to produce less than ten per cent upon the cost of the construction

of the road.   Even if it be conceded, that the power to alter, amend, or repeal, reserved by the act of March 11, 1831, is a power not merely to put an end to the contract, or to take away or modify the exercise of purely incorporeal franchises thereby granted, such as the right of corporate life, etc., — but also the power to take away franchises which are assignable, and which require for their enjoyment the use of corporate property, such as the power to take tolls, which is denied, — even then it cannot fairly be said that the subsequent agreement in the charter, that tolls should not be reduced below a certain point, or except in a certain way, is subject to the previous declaration of the general law so far that the Legislature can under that general law do precisely what it has agreed by the special provision of the charter it will not do.   The whole theory of investments in the stocks and bonds of toll taking corporations rests upon the proposition that not only do the stockholders and creditors obtain title to or security upon the real estate and the visible personal property, but also title to that by which alone that real estate and visible personal property are valuable, to wit, the common law right and the franchise to take tolls ; so that although the corporation may forfeit its charter, or its charter may be taken away from it by the Legislature with or without cause, still the shareholders and the creditors have the right and the franchise to take tolls, i. e. the property for which they paid their money.   This question was very fully discussed in *People* v. *O'Brien*, 111 N. Y. 1.

The franchise to take tolls is only a right to charge for the use of property, and the right to compensation for the use is essentially a right to compensation for the property.   Property in anything is only the right to use it and dispose of the use of it.   The right to use the railroad or to charge for the use of it according to the provisions of the charter can no more be taken away or impaired by a legislative act of amendment of the charter than the railroad itself.   The question is not whether the Legislature can repeal the charter, and thus destroy a corporate trustee which holds its property in trust for the shareholders, leaving the shareholders to their common law rights in respect to that property, as was done in *Thornton* v. *Marginal Freight Railway*, 123 Mass. 32.   *Greenwood* v. *Freight Co.* 105 U. S. 13. Nor is it to what extent the Legislature, under the reserved

power to amend the charter, can modify the powers thereby granted in respect to matters upon which the charter is silent, or contains no express provision that the Legislature shall not so modify it, as has been the case in all the decided cases thus far where acts in amendment of the charter have been sustained. The question is simply whether the Legislature under a prior reserved right to amend can take away from the corporation that which by the subsequent grant it expressly agreed it would not.

4. The act is in violation of the provision of the United States Constitution that "no State shall . . . make anything but gold and silver coin a tender in payment of debts."

It assumes to require a common carrier to receive, in payment for service performed, an obligation issued by another common carrier to perform similar service, and to require the other common carrier upon presentation of that obligation to redeem or pay it in money. It makes the obligation of one carrier a tender to another in payment of the debt due to it from a passenger for transportation. It is not essentially different from a statute which should assume to compel any common carrier to perform transportation upon the delivery to it of an obligation to perform similar transportation by another common carrier. The performance of transportation by a carrier creates a debt from the person transported to the carrier, and it is not competent for the Legislature to provide that that debt can be discharged by the tender of the obligation of another carrier to perform similar service. Such an act would be beyond the power of the Legislature, independent of the prohibition of the Federal Constitution, and it is also plainly contrary to that prohibition. The language of the Constitution is, " No State shall . . . coin money, emit bills of credit, make anything but gold and silver coin a tender in payment of debts," etc. Const. U. S. Art. I. § 10.

Undoubtedly this provision was intended to prevent the States from issuing bills of credit, and making them legal tender, as had been done in Massachusetts, where bills of credit had not only been made legal tender, but it had been made a crime to sell or offer property for sale for less in gold or silver than it was worth in such bills. Prov. St. 1780, c. 12, Prov. Laws, (State ed.) 1412–1416.

But it was also undoubtedly intended to prevent the States

from passing laws requiring other things than money to be taken in satisfaction of debts, as, for instance, like the Massachusetts law passed on July 3, 1782, which recited that many persons " possessed of a surplus of the necessaries of life have been unable to satisfy in money the contents of executions obtained against them, and their property taken to satisfy such executions has been sold for that purpose at a rate far less than its value," and then enacted that " in all cases where any person against whom execution has issued at the suit of any private person shall show to the officer serving the same neat cattle, sheep, swine, flour, any kind of grain, or merchantable pine boards, of his own property, for satisfaction of such execution, such officer shall receive such personal estate, and cause three indifferent discreet men . . . to appraise such personal estate to satisfy the execution with all fees, and . . . deliver the same to the creditor . . . in satisfaction of the same execution." Mass. Laws & Resolves, 1782, c. 10.    This law was known as the " Tender Act," and it was to prevent the passage of similar laws in the future by the States that the States were prohibited from making anything but gold and silver coin a tender in payment of debts.    1 Curtis U. S. Const. 268.

5.  The act is invalid, as an absolute delegation of legislative power to the railroad commissioners.

Undoubtedly the Legislature may make an act to take effect or to cease in effect upon the finding of a certain fact by the executive or a commission, for that is only making its taking effect to depend upon a contingency to be ascertained.    But can the Legislature clothe the executive or a commission with discretion to say to what persons the public welfare requires or demands that an act shall apply or not apply?    If it can, why may it not clothe the executive or the commission with power to make such a law on a particular subject as in their discretion the public welfare requires or demands, or to dispense with the operation of a law whenever in their discretion the public welfare requires or demands it shall be dispensed with.

The difficulty with this act is that it attempts to substitute, for the discretion of the Legislature as to what in its own judgment the public welfare requires or demands, the discretion of a commission as to what in their judgment the public welfare requires or demands.    Cooley, Const. Lim. 137, and cases cited.

6. The act is in violation of the Fourteenth Amendment of the United States Constitution and also of the Constitution of the Commonwealth.

It assumes to deprive the defendants of their property without compensation and without due process of law. It assumes to compel them to carry passengers at an arbitrary rate, less than the rate fixed by their directors, and excludes any judicial inquiry as to the reasonableness of the rate fixed by it, and thus deprives the defendants of their property without due process of law. Except so far as the Legislature has agreed that it will not, it may undoubtedly fix reasonable rates of compensation for the use of property put to a public use, like that of railroad corporations. But this power to regulate, like every power of the government, must be exercised in subordination to the constitutional provision that private property shall not be taken for public use without compensation, and that no person whether natural or incorporated shall be deprived of his property without due process of law. If, therefore, the rate fixed by the Legislature is not a reasonable rate ; or if the question whether it is a reasonable rate cannot, under the act of the Legislature, be inquired into, the St. 1892, c. 389, violates these provisions of the Constitution.

An act which deprives a carrier of a reasonable rate of compensation for service performed takes its property as much as one which deprives it of its real estate. An act which prevents the carrier from showing in the courts that the rate fixed by the act is not a reasonable rate deprives it of its property without due process of law as much as one which requires it to pay a sum of money and prevents it from showing that it does not owe it. The St. 1892, c. 389, does this beyond question. It neither provides for nor admits of any investigation by the courts as to the reasonableness of the rate which it establishes. In a proceeding to enforce it there is, if the law be constitutional, no fact to traverse except the violation of the law. It is in this respect precisely like the statute of Minnesota which the Supreme Court of the United States held was for that reason unconstitutional. *Chicago, Milwaukee, & St. Paul Railway* v. *Minnesota*, 134 U. S. 418.

Perhaps it may be suggested that, as the act does not pro-

vide that the reasonableness of the rate fixed by it shall not be tried in the courts, therefore the reasonableness of it may be thus tried. But an act fixing rates which provides no method by which the reasonableness of the rate fixed can be tried in the courts necessarily excludes such a trial. It is like an act authorizing the taking of property for a public use, which provides no method for ascertaining what is reasonable compensation.

The whole scheme and purpose of St. 1892, c. 389, exclude any judicial inquiry as to the reasonableness of the rates fixed by it. The act is applicable to all railroad carriers who are not exempted or excluded from it, and if under it each carrier to which it applies can try the question of the reasonableness of the rates as applied to it, then the whole purpose of the act may be defeated by a decision in the courts that as to one carrier the rate is reasonable, and therefore applicable, and as to another it is unreasonable, and therefore not applicable.

The intention plainly was that all railroad corporations which were not exempted or excluded from its provisions by the railroad commissioners should carry at the rate fixed by the act, and it excludes any inquiry in the courts as to the reasonableness of the rate fixed as much as though it had expressly so declared.

The Legislature has just as much power to require that the cars and engines, or the railroad itself, shall be absolutely given for a promise or obligation to pay, as it has to require that the use of them, or the service performed by such use, shall be given for such a promise or obligation. It is only the use of the cars, engines, and railroad which makes them valuable. The right to use and to receive compensation for use of anything is all that really makes it property. "Use is the real side of property." *Wynehamer* v. *People*, 13 N. Y. 378, 433. 2 Austin, Jur. (3d ed.) 817, 818. *Eaton* v. *Boston, Concord, & Montreal Railroad*, 51 N. H. 504. *Thompson* v. *Androscoggin River Improvement Co.* 54 N. H. 545.

But it is said, " A corporation is a mere creature of the Legislature, and as the Legislature created it, it can do what it pleases with it." This is a popular expression, but an inaccurate one. A corporation is no more a creature of the Legislature than a limited partnership. A corporation is in reality only an association of private persons precisely like a limited partnership, except

that private persons associated in the form of a corporation can assign their interests to others, and thus give to the association perpetual life, and can act by directors and by a common seal in a more effective and convenient way than the special partners in a limited partnership, and that all of the associates, instead of a part only, are liable to creditors to the extent of the capital contributed by them.

The Legislature cannot, however, destroy or take the private property of the associates in the corporation any more than it can destroy or take the private property of the associates in a limited partnership.   Both are creatures of the Legislature in the sense that the Legislature has given them certain powers as to their modes of action in respect to their private property. Neither of them is subject to the control of the Legislature in respect to their property more than the other.   If the corporation or the partnership put their property to a public use, they are both subject, like all persons, natural or artificial, to legislative regulation as to the method of use and the compensation for such use, but they are equally with private persons protected from such a regulation, if it impairs the value of their property or compels them to receive for the use of their property anything but money.

The St. 1892, c. 389, is precisely like one which should require A. to labor for B., or give him his property, at a fixed price, upon the written promise of C. to pay that price, and require C. to perform such promise when it is presented to him by A. It is immaterial that this act requires C. to issue his promise, for the question upon this branch of the discussion is not whether C. can be required to issue the promise, but only whether when it is issued A. can be compelled to give B. his labor or property for it.

Such an act would not be valid as to natural persons.   Nobody would claim it.   How then can it be valid as to artificial persons, — corporations?   Has the Legislature any more power to require corporations to give their labor or property to others without compensation in money, than to require natural persons to do so? If so, from what source does it obtain that power?   How have the natural persons composing the defendant corporations lost the protection of the Federal and State Constitutions, so that

they may be required to give their services, or their property, for the promises or obligations of others?

The only answer made is that the Legislature reserved in the charter by the St. 1831, c. 81, the power to compel them to do it. But the Legislature never had the power to do this. Could it reserve out of its grant the power to do something which it could not do if the grant had not been made? If the charters had in express terms reserved to the State the power to compel the corporation at any time to receive in payment of debts due them something else than money, it would only have been an attempt to create by reservation a power which the Federal Constitution says the State shall not have.

If the charters had expressly reserved to the Legislature the power to take from the corporations their property without process of law, or without compensation, it would only have been an attempt by reservation to create in the Legislature a power to violate the State Constitution.

FIELD, C. J. The brief for the Old Colony Railroad Company raises the questions, whether the Attorney General has any right to bring the informations, and whether the court has any jurisdiction over the proceedings. It is said that St. 1892, c. 389, does not give the court equity jurisdiction to enforce its provisions. But we do not regard these informations as informations in equity. They are rather petitions for a writ of mandamus. See Pub. Sts. c. 186, § 13.

It concerns the public, or an indefinite portion of the public, whether railroad corporations not exempted or excluded by the railroad commissioners shall obey St. 1892, c. 389, and therefore we think that the Attorney General, as representing the public, can properly institute these proceedings. *Attorney General* v. *Boston,* 123 Mass. 460.

At the hearing of the petition against the Old Colony Railroad Company the presiding justice excluded evidence, against its objection, "tending to prove the allegation of fact in the third, seventh, and eighth paragraphs of its answer." These paragraphs are as follows:

"Third. The railroads thus operated by it [the defendant] are in the States of Massachusetts and Rhode Island, and form connecting and continuous lines of interstate transportation and ,

travel, and the regulation of the rates for and the conduct of passenger transportation thereon in this State substantially affect the rates for and the conduct of said interstate transportation thereon."

"Seventh. It says that there are railroad corporations operating railroads in the Commonwealth that are not pecuniarily responsible for the redemption and payment of tickets which may be issued by them under chapter 389 of the Acts of the Year 1892."

"Eighth. It says that chapter 389 of the Acts of the Year 1892, referred to in said information, is a reduction of its fares and tolls for passenger transportation established by its directors, and of its earnings therefrom, contrary to the provisions of its charter, and is not a revision or alteration of its fares and tolls in the manner prescribed thereby, or by the general law relating to railroad corporations."

The St. 1892, c. 389, can, we think, be construed as relating only to the fares for the transportation of passengers from one point to another within the Commonwealth; and if under the existing regulations of a railroad company there may be some difficulty in applying the law when a passenger intends to proceed from or to a point within the Commonwealth to or from a point outside of the Commonwealth, we do not see that this difficulty is inherent in the subject, or that by proper regulations the fares of passengers for transportation within the Commonwealth cannot be paid for by mileage tickets although the passengers are travelling to or from a place beyond the limits of the Commonwealth. It is no sufficient objection to the statute that it may incidentally affect commerce between the States, if it does not attempt to regulate such commerce. See *Louisville, New Orleans, & Texas Railway* v. *Mississippi*, 133 U. S. 587.

The averments of the seventh paragraph relate to a possibility rather than a fact, because it is not alleged that any railroad corporations which are not pecuniarily responsible have issued any mileage tickets under St. 1892, c. 389, or that all such corporations have not been excluded from the provisions of the statute by the railroad commissioners. It is, in effect, an argument by way of an example of what might happen if one railroad company is required to transport passengers on the credit

of another. The constitutionality of the statute cannot depend upon the solvency or insolvency of any particular railroad company at any particular time.

The averments of the eighth paragraph are not that St. 1892, c. 389, will, if carried into effect, operate to reduce the fares for passenger transportation below what is reasonable, but only that the statute will cause a reduction contrary to the provisions of the charter of the defendant. The Old Colony Railroad Company is a corporation in this Commonwealth and in the State of Rhode Island, formed by the union of various railroad corporations chartered by this Commonwealth or by the State of Rhode Island, and is also the lessee of the Boston and Providence Railroad Corporation and of other railroad corporations. The earliest charter of any of the railroads leased is that of the Boston and Providence Railroad Corporation, which was approved June 22, 1831. The earliest charter of any of the railroads which make up this defendant corporation is that of the " Taunton Branch Railroad Corporation," which was approved April 7, 1835, being St. 1835, c. 131. The fourth section of this last named statute contains the provision " that the Legislature shall not at any time so reduce the tolls and other profits as to produce less than ten per cent per annum upon the capital stock paid, as aforesaid, without the consent of said corporation." The charters of some other railroads which have been united to form the Old Colony Railroad Company contain similar provisions. These charters also grant to the corporations the right to take tolls at such rates as may be established by the directors. Similar provisions were enacted in Rev. Sts. c. 39, § 83, and in Gen. Sts. c. 63, § 112. The St. 1870, c. 325, repealed Gen. Sts. c. 63, § 112, and in § 1 provided as follows: " Any railroad corporation may establish, for its sole benefit, fares, tolls, and charges upon all passengers and property conveyed or transported on its railroad, at such rates as may be determined by the directors thereof, and may from time to time by its directors regulate the use of its road: provided that such rates of fares, tolls, and charges, and regulations, shall at all times be subject to revision and alteration by the Legislature, or such officers or persons as the Legislature may appoint for the purpose, anything in the charter of any such

railroad corporation to the contrary notwithstanding." St. 1874, c. 372, § 4, is as follows: "Railroad corporations heretofore established in this Commonwealth, whether by special act or in conformity with the provisions of the general law passed in the year one thousand eight hundred and seventy-two, shall have the powers and privileges, and be subject to the duties, liabilities, restrictions, and other provisions contained in this act; which, so far as inconsistent with charters granted since the eleventh day of March, one thousand eight hundred and thirty-one, shall be deemed and taken to be in alteration and amendment thereof: provided, that nothing herein contained shall be construed to impair the validity of any special power heretofore conferred by charter or other special act upon any particular railroad corporation which has already exercised such power, or to prevent the continued exercise thereof, conformably, so far as may be, to the provisions of this act; nor shall anything herein contained affect any act done or any right accruing, accrued, or established, or any proceedings, doings, or acts ratified or confirmed, or any suit or proceeding had or commenced in any case before the act takes effect," etc. Section 179 of this statute is as follows: "Any railroad corporation may establish for its sole benefit fares, tolls, and charges upon all passengers and property conveyed or transported on its railroad, at such rates as may be determined by the directors thereof, and may from time to time, by its directors, regulate the use of its road: provided, that such rates of fares, tolls, and charges, and regulations, shall at all times be subject to revision and alteration by the Legislature, or such officers or persons as the Legislature may appoint for the purpose, anything in the charter of any such railroad corporation to the contrary notwithstanding." These provisions were re-enacted in Pub. Sts. c. 112, §§ 3 and 180. All the charters involved in these proceedings were granted subsequently to the passage of St. 1830, c. 81, approved March 11, 1831, which provided "that all acts of incorporation, which shall be passed after the passage of this act, shall at all times hereafter be liable to be amended, altered, or repealed at the pleasure of the Legislature, and in the same manner as if an express provision to that effect were therein contained; unless there shall have been inserted in such act of incorporation an

express limitation as to the duration of the same." Rev. Sts. c. 44, § 23. Gen. Sts. c. 68, § 41. Pub. Sts. c. 105, § 3.

It is evident that the Legislature, in the year 1870 and since, has attempted to repeal the special provisions of the early charters of railroads which purported to limit its right to reduce fares or tolls so as to produce annually less than ten per cent of the cost of the roads. An examination of the statutes will show that since the year 1870 the Old Colony Railroad Company has accepted the benefit of legislation " subject to all general laws which now are or hereafter may be in force relating to railroad corporations." One instance mentioned in the brief of this company is the union of the company with the Boston, Clinton, Fitchburg, and New Bedford Railroad Company, pursuant to St. 1882, c. 80. The Boston, Clinton, Fitchburg, and New Bedford Railroad Company was formed by the union of the following railroads. The Agricultural Branch Railroad Company was incorporated by St. 1847, c. 269, and was subject " to all the duties, liabilities, and restrictions set forth in the forty-fourth chapter of the Revised Statutes, and in that part of the thirty-ninth chapter of said statutes relating to railroad corporations, and in the public statutes which have been, or may be, passed relating to railroad corporations." The name of this railroad company was, by St. 1867, c. 153, changed to the Boston, Clinton, and Fitchburg Railroad Company. The New Bedford Railroad Company was incorporated by St. 1873, c. 20, " subject to all the restrictions, duties, and liabilities set forth in all the general laws which now are, or hereafter may be, in force relating to railroad corporations," and this company, after it had purchased or united with the Taunton Branch Railroad Company, was authorized to unite " with the corporation that may be formed by the union of the Mansfield and Framingham Railroad Company with the Boston, Clinton, and Fitchburg Railroad Company." Not one of these charters contains any provision that the tolls should not be reduced by the Legislature so as to produce annually less than ten per cent of the cost of the roads, or any provisions on the subject. It may at some time deserve consideration whether, when a railroad company voluntarily unites with other railroad companies, and there are special provisions concerning tolls in some of the charters and none in others, and the union is effected under a statute which provides

that the corporation thus formed shall be subject to all general laws which now are or hereafter may be in force relating to railroad corporations, these special provisions continue in force and are applicable to the consolidated corporation. In view of the many changes in the charters of nearly all the railroad corporations of the Commonwealth occurring since the year 1870, which have been accepted by the corporations, it may well raise a doubt whether these corporations have not consented to be subject to any laws which the Legislature, under its general powers, may constitutionally enact concerning fares or tolls. But whether these special provisions can be regarded as still in force, and if so whether they could be repealed by the Legislature without the consent of the corporation, under the power reserved to amend, alter, or repeal the charters, we have not found it necessary to determine in the present cases.

It is argued by both defendants that St. 1892, c. 389, is in violation of the provision of the Constitution of the United States, Art I. § 10, that "no State shall . . . make anything but gold and silver coin a tender in payment of debts." The meaning of the statute is, we think, that the delivery of a mileage ticket shall discharge the passenger from liability to the railroad for his transportation, but that the railroad issuing the ticket shall be liable to pay to the railroad transporting him, in lawful money, the statutory price of the ticket or part of a ticket which the passenger has surrendered. The intention is, that the railroad performing the service shall ultimately be paid the statutory fare in lawful money, not that the ticket of itself shall be a legal tender.

If the Legislature cannot constitutionally require a railroad company to transport a passenger unless the fare is paid in advance, we have no doubt that the delivery of a mileage ticket issued by another corporation is not of itself a payment of the fare. We assume, however, in favor of the Commonwealth, without deciding or expressing any opinion upon it, that it is not absolutely necessary that the fare of a passenger on a railroad be paid in advance in money.

There remain to be considered the objections of both defendants, that the statute establishes a uniform rate per mile, and requires one railroad company to transport a passenger

upon the credit of another; that the conditions affecting the transportation imposed by the road which issues the tickets must be performed by any other road to which the ticket is presented, unless the road is exempted or excluded from the provisions of the statute; and that authority is given to the railroad commissioners to exempt or exclude from the provisions of the statute any railroad, if in their judgment the public welfare or the financial condition of the road requires or demands it.   The Legislature has prescribed the rate of fare per mile, but has not undertaken to prescribe in other respects the form of contract which each railroad may make for the transportation of passengers.   It has not adopted a standard form of contract, as it has done, for example, with reference to fire insurance policies.    Pub. Sts. c. 119, § 139.    One company may permit no baggage of any kind to be carried with the passenger on a mileage ticket, and another company may permit personal baggage, or any baggage to an amount not exceeding one hundred or one thousand pounds in weight, and according to the terms of the first section of the statute one railroad must, on the presentation of a mileage ticket issued by another, perform the conditions of the contract as issued by the other.

The power of the legislature of a State to prescribe the charge, or the maximum charge, to be made for the use of property "affected with the public interest," was first elaborately considered by the Supreme Court of the United States in what are called the Granger cases: *Munn* v. *Illinois*, 94 U. S. 113; *Chicago, Burlington, & Quincy Railroad* v. *Iowa*, 94 U. S. 155; *Peik* v. *Chicago & Northwestern Railway*, 94 U. S. 164; *Chicago, Milwaukee, & St. Paul Railroad* v. *Ackley*, 94 U. S. 179; *Winona & St. Peter Railroad* v. *Blake*, 94 U. S. 180; *Stone* v. *Wisconsin*, 94 U. S. 181.   Whatever difference of opinion there may have been among the justices of that court concerning the tests which determine whether property is affected with a public interest, there is no doubt that the property of railroad corporations which have been invested by the legislature with the right of eminent domain, and are common carriers of persons or merchandise, is property "devoted to a public use."   See *Chicago & Grand Trunk Railway* v. *Wellman*, 143 U. S. 339, and *Budd* v. *New York*, 143 U. S. 517.   The justices of the

Supreme Court of the United States perhaps differ in opinion whether there can be any judicial interference with the rates for railroad transportation established by the legislature of a State on the ground that they are not reasonable, but they agree that the property of railroads is property devoted to a public use, and that the legislature may establish rates, or reasonable rates, unless there is an express provision in the charter which forbids it.   See *Chicago, Milwaukee, & St. Paul Railway* v. *Minnesota*, 134 U. S. 418, and *Budd* v. *New York, ubi supra.*

In the Railroad Commission cases, *Stone* v. *Farmers' Loan & Trust Co.,* 116 U. S. 307, *Stone* v. *Illinois Central Railroad*, 116 U. S. 347, and *Stone* v. *New Orleans & Northeastern Railroad*, 116 U. S. 352, a majority of the Supreme Court of the United States decided that a grant to a railroad company in its charter of the right to fix and regulate. the tolls and charges, substantially such as are contained in the charters of the defendants in the present cases, does not deprive a State of its power to regulate rates.   The court say, in *Stone* v. *Farmers' Loan & Trust Co.,* " It is now settled in this court that a State has power to limit the amount of charges by railroad companies for the transportation of persons and property within its own jurisdiction, unless restrained by some contract in the charter, or unless what is done amounts to a regulation of foreign or interstate commerce." p. 325.   The court held that a general power given to the corporation to establish rates is not such a contract as restrained the legislature from establishing what it deemed reasonable rates.   See *Pennsylvania Railroad* v. *Miller*, 132 U. S. 75.   It was also said, " Under pretence of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law." p. 331.   See *Georgia Railroad & Banking Co.* v. *Smith*, 128 U. S. 174 ; *Dow* v. *Beidelman*, 125 U. S. 680 ; *Ruggles* v. *Illinois*, 108 U. S. 526.

In *Parker* v. *Metropolitan Railroad*, 109 Mass. 506, the authority of the Legislature of this Commonwealth was maintained to fix the rate of toll to be paid by a street railway company to the East Boston Ferry Company for the carriage of passengers in cars over the ferry.   There was a provision in the charter of

the ferry company that the company should be allowed to collect and receive such tolls as the mayor and aldermen of Boston might determine, provided that "the rates of ferriage shall never be so much reduced as to reduce the yearly dividends of said company to an amount less than eight per cent on the amount of capital stock actually invested." St. 1852, c. 244, § 2. The decision is put upon the ground that the statute fixing the rates is an amendment of the charter. The court say: "The power of regulating tolls upon ferries, bridges, and turnpikes has been constantly exercised by the Legislature. The great object of such corporations is the accommodation of public travel; and most, if not all, of the charters creating them contain provisions for the regulation of the tolls they are entitled to charge the public. The charter of the East Boston Ferry Company contains such provisions. The legislation in question, therefore, is not upon a subject foreign to the provisions of the charter or the objects of the grant. It is strictly in alteration or amendment of such provisions; and it is designed to promote the chief object of the grant." It appears from the original papers in that case that the mayor and aldermen of Boston had fixed rates of toll over the ferry for foot passengers and for vehicles, but none expressly for street cars, and that the rates fixed for foot passengers were twice or three times as much as those fixed in the statute for passengers in the street cars. It also appears that the established rates of toll were not sufficient to enable the company to pay any dividends on the capital stock actually invested. The court did not, however, expressly consider whether the provision of the charter, that the tolls should not be so reduced as to produce yearly dividends of "less than eight per cent on the amount of capital stock actually invested," constituted a contract which could not be avoided except by a repeal of the charter. The statute there considered affected only the rates of toll for passengers in street cars, leaving untouched all other rates. See *Roxbury* v. *Boston & Providence Railroad*, 6 Cush. 424; *Massachusetts General Hospital* v. *State Assurance Co.* 4 Gray, 227; *Fitchburg Railroad* v. *Grand Junction Railroad*, 4 Allen, 198; *Commonwealth* v. *Eastern Railroad*, 103 Mass. 254; *Mayor, &c. of Worcester* v. *Norwich & Worcester Railroad*, 109 Mass. 103; *In re Mayor, &c. of Northampton*, 158 Mass. 299.

It is conceded in the present cases, as we understand, that the legislature of a State, unless prevented by some contract, can constitutionally establish reasonable rates of fare for railroad companies within the State, and we regard it as settled that the legislature of a State having a constitution like that of Massachusetts can establish rates of fare for the transportation within the State of passengers and merchandise by railroad companies which are common carriers, unless the State is prevented by some contract with the railroad company.   It is not yet settled, however, what the limitations of this power are; whether it is limited to such rates as a court may deem reasonable, or only to such rates as shall not operate to deprive the railroad companies of their property without reasonable compensation, or without due process of law.   It becomes, however, unnecessary at the present time to determine the limitations of this power, because it has not been contended in the present cases ·that the rates established by the statute are unreasonable.

The Legislature, if it sees fit, can establish rates for each railroad separately, and as different railroads may reasonably require different rates, we see no objection to the statute on the ground that certain railroads may be exempted or excluded from its provisions.   The subject is one upon which legislation need not be uniform, and the statute cannot be avoided by one railroad company because it is not applied to another.   *In re Mayor, &c. of Northampton, ubi supra.*   We think that the intention of the statute is that it shall apply to every railroad corporation operating a railroad for the common carriage of passengers within the Commonwealth, unless the board of railroad commissioners shall determine, on petition after due hearing, that there is something exceptional in the financial condition of a particular railroad, or in the character of the service it renders to the public, which reasonably requires that railroad to be exempted or excluded from the provisions of the statute, leaving such a railroad to be specially dealt with by the Legislature, if it should deem it necessary.   We are not satisfied that the statute is unconstitutional on the ground that it contains a delegation of legislative power to the board of railroad commissioners.

The most formidable objections are, that the statute authorizes one railroad to determine the conditions on which another

railroad must carry passengers, and compels one railroad to carry passengers on the credit of another. We have been referred to no judicial decision where any such legislation has been considered.

The law governing the taking of private property for public uses affords some analogies which we think are applicable to the present cases. The decisions of this court perhaps go as far as any in permitting an entry upon land, and an occupation of it, for the purpose of taking it for public uses before reasonable compensation has actually been made, and in not requiring that an adequate fund for compensation be set apart before the entry and occupation. Still, there must be an adequate provision for compensation ; and a provision that the land should be paid for out of the earnings of a railroad which was owned by the Commonwealth was held not to be adequate, although it was probable that such earnings would be sufficient. *Connecticut River Railroad* v. *County Commissioners*, 127 Mass. 50. But in the case of land, if the landowner takes proper measures to have his compensation determined, and it is not ultimately paid, a court of equity would enjoin the company taking the land from the further use of it, and the owner could retake the land or enforce his lien upon it. " The power to take and the obligation to indemnify for the taking are inseparable." *Drury* v. *Midland Railroad*, 127 Mass. 571, 576. *Brickett* v. *Haverhill Aqueduct*, 142 Mass. 394. *Cushman* v. *Smith*, 34 Maine, 247. *Riche* v. *Bar Harbor Water Co.* 75 Maine, 91. The statute authorizing the taking must contain some provision for obtaining adequate indemnity. It is not enough to leave the owner to his action at law for damages. " The duty of paying an adequate compensation, for private property taken, is inseparable from the exercise of the right of eminent domain. The act granting the power must provide for compensation, and a ready means of ascertaining the amount. Payment need not precede the seizure ; but the means for securing indemnity must be such that the owner will be put to no risk or unreasonable delay." *Haverhill Bridge* v. *County Commissioners*, 103 Mass. 120, 124. *Thacher* v. *Dartmouth Bridge*, 18 Pick. 501. If this is true when the property taken is land, much more is it true when the property taken is consumed in the use, so that, if compensation is not ultimately

paid, the owner has no remedy by taking back the property. When property is taken for a public use and is consumed in the use, the provision for adequate compensation certainly ought to be more than a mere right of action against a private person or corporation, with the risk of never obtaining satisfaction, and the compensation when it is. made must be made in money. *Commonwealth* v. *Peters*, 2 Mass. 125. *State* v. *Beackmo*, 8 Blackf. 246. *State* v. *Ravine Road Sewer Commissioners*, 10 Vroom, 665. *Vanhorne* v. *Dorrance*, 2 Dall. 304. Cooley, Const. Lim. 691, 694. Lewis, Eminent Domain, § 460. Under the statutes of this Commonwealth, the compensation assessed for the taking of land by a railroad company ultimately assumes the form of a judgment at law, which must be satisfied, in money, and it is provided that a "warrant of distress or execution may issue to compel the payment thereof with costs and interest, and all its right and authority to enter upon and use the land or property, except for making surveys, shall be suspended until such warrant or execution is satisfied." Pub. Sts. c. 112, § 101. At common law, a common carrier of passengers could demand prepayment of the fare before he could be compelled to receive and transport passengers. The fare demanded must be reasonable, and when it is established by statute, this is a legislative determination of what is reasonable. A carrier can have no lien on the passenger to secure the payment of the fare, and must of necessity collect the fare in advance or trust to the credit of the passenger or of some other person. See *Fitchburg Railroad* v. *Gage*, 12 Gray, 393. *McDuffee* v. *Portland & Rochester Railroad*, 52 N. H. 430. *Spofford* v. *Boston & Maine Railroad*, 128 Mass. 326.

Although, by reason of the public nature of the employment, the Legislature can establish the rates of fare to be demanded by common carriers of passengers, we do not see that such carriers can be compelled ultimately to take in payment anything which any other person could not be compelled to take in payment of a service rendered or in discharge of a debt. If a debt had been once incurred, it could not be discharged except by a payment in money, or by the satisfaction of an execution by a levy upon tangible property. Although there may be little or no practical difficulty between solvent railroads if they choose to obey the

statute, yet in theory each ticket or part of a ticket surrendered by a passenger for transportation represents a separate cause of action against the railroad issuing it. There is no fund provided for the redemption of the ticket, and no tangible property on which there is a lien. The statute puts no limit upon the number of mileage tickets which any railroad may issue, or upon the time within which they must be used. It does not prohibit a railroad from selling them for less than twenty dollars each, although it must redeem them at that price. It is possible that a railroad in need of money might resort to enormous sales of such tickets as a mode of raising money, and that these tickets might remain outstanding, to be used on other roads indefinitely, and that many of them might be presented for redemption at some remote time in the future, when the railroad company issuing them might be unable to redeem them. If it be assumed that, under the power to regulate the fares of common carriers of passengers, the Legislature can require the passengers to be carried before the fares have been actually paid in money, the security for the ultimate payment of the fares in money ought, we think, to be as certain as that required when private property is taken for public uses, and we are of opinion that this statute does not provide adequate security.

The objection that the statute authorizes one railroad to make conditions concerning the transportation of passengers which must be performed by other railroads, also seems to us valid. The objection is not that the Legislature has itself attempted to declare the rights of passengers who have purchased mileage tickets. The Legislature by this statute has not determined the conditions which shall be incident to the carriage of passengers under these tickets, nor has it left them to be determined by the railroad company transporting the passengers. One railroad is in effect authorized to make a contract for another, but the railroads are not in fact the agents of each other in issuing these tickets. It has been often said that the Legislature cannot make a contract between two or more persons which they do not choose to make, although it may sometimes impose duties which can be enforced as if they arose from contract. Without denying the power of the Legislature to determine the form of the contracts which common carriers of persons

or merchandise must make concerning transportation, and without considering the authority of the Legislature to delegate this power to a board of public officers, we are of opinion that this power cannot be delegated to private persons or corporations.

It is not necessary or practicable to attempt in these cases to determine just how far the Legislature can go by way of regulating the business of railroad companies within the Commonwealth, nor just where the limits of its power end, nor whether certain provisions of the statute, if taken alone, would be valid. The statute must be considered as a whole.   The statute requires a railroad company to transport passengers, and to receive therefor tickets or coupons which merely give separate causes of action against another railroad company, and no security is provided that these tickets or coupons will be redeemed in money by the railroad company issuing them when presented for redemption, and they may be used for transportation long after they are issued.   The company issuing these tickets may impose upon another railroad duties and responsibilities in the carriage of passengers different from those which the latter company assumes towards passengers who purchase tickets of itself, and the tickets are intended to be used indiscriminately upon all railroads within the Commonwealth not excluded or exempted from the provisions of the statute, and are not confined to railroad companies engaged in transporting passengers in connection with the company issuing the tickets.   The railroad commissioners may exercise their power of excluding a railroad company from the provisions of the statute in season to prevent loss from a failure of the company to redeem the tickets issued, or they may not.   The rights of railroad companies ultimately to receive in money the fares of passengers ought not to depend upon the discretion of the railroad commissioners, and if the statute would be invalid but for this discretion this power in the railroad commissioners would not make it valid.

Mr. Justice Lathrop and Mr. Justice Barker agree that the informations are rightly brought by the Attorney General, and that the court has jurisdiction, and are of opinion that the necessary effect of the statute is to apply and appropriate individual property to the public use without the owner's consent, and without legal provision for a reasonable compensation there-

for; and for this reason they agree that the statute is void, without expressing an opinion upon the other matters discussed in this opinion.

A majority of the court are of opinion that the petitions should be dismissed.    *So ordered.*

KNOWLTON, J. I concur in everything contained in the opinion of the Chief Justice except the discussion of the two points on which the decision is made to turn, but I do not agree with him in that, and I do not think the statute unconstitutional. In his opinion the question whether the statute is void as impairing the obligation of contracts contained in the several charters under which the railroads were organized was somewhat considered, but not decided. In the view which I take of other parts of the case, it becomes necessary to consider this question further. I need not go over the ground traversed by the Chief Justice. It is obvious that the object of St. 1830, c. 81, (Rev. Sts. c. 44, § 23,) was to prevent charters afterwards granted by the Legislature from being held to be contracts; and all subsequent charters must be deemed to have been granted subject to that general law, except in cases where the Legislature saw fit plainly to abrogate it. If a charter was afterwards granted which expressly professes to bind the Commonwealth by a contract, doubtless the Commonwealth is bound; but in interpreting subsequent charters this general law must be given effect so far as it can be without coming in direct conflict with express contracts, plainly intended as such by the Legislature. If we assume that in some of the charters of railroad corporations now included in the Old Colony Railroad Company there was an express contract that the Legislature should not reduce the fares and charges so as to leave an income of less than ten per cent on the cost of the railroad, and that the general law above cited does not apply to these contracts, so far as they have been executed on either side, it must still be held that the Legislature could at any time amend or repeal these provisions of the charters so as to prevent future action on the faith of them, leaving them in effect only so far as rights had accrued by the execution of them. It would be very unreasonable to hold that by such a provision the Legislature was bound for all time to allow rates and charges

which would produce an income of ten per cent, not only on the cost of the railroad as first built and completed under the charter, but also on every extension, enlargement, or improve_ ment of it after it had been completed according to the original plan. By St. 1870, c. 325, § 1, re-enacted in St. 1874, c. 372, §§ 4, 179, which last sections are still in force, the Legislature terminated the right of these railroad corporations to go on expending money and increasing the cost of their railroads under a contract which permitted them, without the possibility of legislative interference, to charge fares which would give them an income of ten per cent on the cost of the road, if such a right had previously existed. As I understand the report, the Old Colony Railroad Company did not contend at the hearing that the statute under consideration would reduce its income below ten per cent on the cost of the road at the time its right to build a road or to increase the cost of it under the provisions of the original charters was terminated by the St. of 1870. Moreover, I am of opinion that the Old Colony Railroad Company, by accepting the benefit of legislation subject to general laws which gave the Legislature the right to revise its fares, rates, and charges, has lost the right, if it ever had it, to interpose the provisions of the original charters against a statute which assumes in a reasonable way to regulate or reduce its fares.

In the suit against the Boston and Albany Railroad Company, nothing appears in the record which opens this defence, or requires consideration of the numerous statutes under which the corporation is acting. I am therefore of opinion that the petitions should not be dismissed on the ground that the statute impairs the obligation of contracts securing to the defendants immunity from reduction of fares.

The only grounds on which the statute is held unconstitutional by the majority of the court are, first, that it seeks to compel the transportation of passengers by one railroad on the credit of another, to which money for payment of the fare has been advanced by the purchaser of a mileage ticket; and, secondly, that a mileage ticket is to be " accepted and received for fare and passage " upon other railroads " under like conditions as upon the line or lines of the corporation issuing such ticket."

The property of railroad corporations is devoted to a public use.

The truth of this proposition is nowhere questioned.  Such corporations may exercise the right of eminent domain by taking lands for their roads against the will of the owners.  The business of providing highways and arranging conveniences to enable people easily to pass from place to place is a part of the public business which may be done by the State.  If the State grants franchises, and delegates the transaction of this business to corporations, it retains the right to regulate the business for the public good in any reasonable way.  It may do this in the exercise of the police power, which is a power inherent in every well ordered system of government.  It is the power which is granted in terms to our Legislature by article 4 of chapter 1 of the Constitution of Massachusetts, which gives the General Court full power and authority " from time to time to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, and ordinances, directions and instructions, either with penalties or without, so as the same be not repugnant or contrary to this Constitution, as they shall judge to be for the good and welfare of this Commonwealth, and for the government and order thereof and of the subjects of the same, and for the necessary support and defence of the government thereof," etc.  Moreover, most of the charters of railroad corporations have been granted and accepted subject to a reserved right in the Legislature to alter or repeal them.  It is settled that this right to regulate the business of railroad corporations extends so far as to authorize the Legislature to fix the rates and charges for the transportation of passengers and freight.  The principle is established by decisions, not only of this court, and of the Supreme Court of the United States, but of courts in most of the other States.  *Parker* v. *Metropolitan Railroad,* 109 Mass. 506.  *Chicago, Burlington, & Quincy Railroad* v. *Iowa,* 94 U. S. 155.  *Peik* v. *Chicago & Northwestern Railway,* 94 U. S. 164.  *Munn* v. *Illinois,* 94 U. S. 113.  *Ruggles* v. *Illinois,* 108 U. S. 526.  *Chicago & Grand Trunk Railway* v. *Wellman,* 143 U. S. 339.  *Budd* v. *New York,* 143 U. S. 517.  *People* v. *Boston & Albany Railroad,* 70 N. Y. 569.  *People* v. *Budd,* 117 N. Y. 1.  *Chesapeake & Potomac Telephone Co.* v. *Baltimore & Ohio Telegraph Co.* 66 Md. 399, 414.  *Lake Shore & Michigan Southern Railway* v. *Cincinnati, Sandusky, & Cleveland Railway,* 30 Ohio St. 604.  *Hockett* v. *State,* 105 Ind. 250, 258.    *Central Union Telephone*

Co. v. *Bradbury*, 106 Ind. 1; *Central Union Telephone Co.* v. *State*, 118 Ind. 194, 207. *Baker* v. *State*, 54 Wis. 368, 373. *Nash* v. *Page*, 80 Ky. 539, 545. *Mayor, &c. of Mobile* v. *Yuille*, 3 Ala. 137, 140. *Stone* v. *Yazoo & Mississippi Valley Railroad*, 62 Miss. 607, 639. A minority of the justices of the Supreme Court of the United States dissent from decisions of the majority extending the doctrine to the regulation of charges for the use of grain elevators, (*Munn* v. *Illinois*, 94 U. S. 113, and *Budd* v. *New York*, 143 U. S. 517, 549,) making a distinction between what they consider a public use of property and a public interest in the use of property. But they agree with the majority that railroad corporations are subject to regulation. Mr. Justice Field, one of this minority, in giving the opinion of the court in *Georgia Railroad & Banking Co.* v. *Smith*, 128 U. S. 174, 179, says : " The incorporation of the company, by which numerous parties are permitted to act as a single body for the purposes of its creation, or, as Chief Justice Marshall expresses it, by which ' the character and properties of individuality ' are bestowed ' on a collective and changing body of men,' *Providence Bank* v. *Billings*, 4 Pet. 514–562; the grant to it of special privileges to carry out the object of its incorporation, particularly the authority to exercise the State's right of eminent domain that it may appropriate needed property, a right which can be exercised only for public purposes ; and the obligation, assumed by the acceptance of its charter, to transport all persons and merchandise upon like conditions and upon reasonable rates, — affect the property and employment with a public use ; and where property is thus affected, the business in which it is used is subject to legislative control. So long as the use continues, the power of regulation remains, and the regulation may extend not merely to provisions for the security of passengers and freight against accidents, and for the convenience of the public, but also to prevent extortion by unreasonable charges, and favoritism by unjust discriminations. This is not a new doctrine, but old doctrine, always asserted whenever property or business is, by reason of special privileges received from the government, the better to secure the purposes to which the property is dedicated or devoted, affected with a public use." In *Budd* v. *New York*, 143 U. S. 517, 549, Mr. Justice Brewer, another of this minority, says : " The use is pub-

lic, because the public may create it, and the individual creating it is doing thereby and *pro tanto* the work of the State. The creation of all highways is a public duty. Railroads are highways. The State may build them. If an individual does that work, he is *pro tanto* doing the work of the State. He devotes his property to a public use. The State doing the work fixes the price for the use. It does not lose the right to fix the price because an individual voluntarily undertakes to do the work." This is equivalent to saying, what is undoubtedly the law, that it does not lose the right to make any reasonable regulation for the benefit of the public in regard to the transaction of any or of all the railroad business in the State.

The Legislature's determination of what is reasonable is also conclusive, subject only to the limitation that its enactment shall not conflict with any expressed or clearly implied provisions of the Constitution either of the State or of the United States. I am not aware of anything in either Constitution which forbids the State in regulating the public business of transporting passengers within its borders, when the business is carried on by its own creatures, whose financial ability it is supposed to know, from requiring these corporations to issue tickets, which when paid for shall be received for transportation on a line of railroad other than that issuing it, and which shall entitle the carrying railroad to receive its pay from the railroad which issued and sold the ticket. It seems to me plain that this is not within the express provision of our State Constitution, which forbids the taking of private property without compensation, or for other than a public use. I think it is not a taking of property without due process of law within the meaning of that language in the Constitution of the United States, nor an interference with the right " of acquiring, possessing, and protecting property " which is secured by the Declaration of Rights in the Constitution of Massachusetts. It is merely a regulation of public business which the Legislature has a right to regulate. Its apparent object is to promote the convenience of persons having occasion to travel on different railroads, and to reduce for them the cost of transportation. The risk of pecuniary loss to a corporation from carrying a passenger on the credit of another corporation to which the money has been advanced for carriage, instead of

having payment at the time, is almost infinitesimal. In the first place, all railroad corporations are required to make annual reports to the Commonwealth, (Pub. Sts. c. 112, § 81,) and the Legislature is presumed to know that all or nearly all of them are of ample financial ability, and that their obligation to pay a small debt is as good as that of any city or town in the State. Secondly, if there are any now, or if hereafter there should be any, which are not financially sound, it would be the duty of the railroad commissioners, on application, to relieve all other corporations from the obligation to take their tickets. In the natural course of business there would be frequent settlements of accounts between the different railroads, as there are now, and the most that any railroad could owe another under this statute would be the difference between the cost of the other's mileage tickets held by itself, and the cost of its own tickets held by the other, which would ordinarily be but a trifling sum. It would be impossible for any railroad to harm its neighbors by issuing and selling a large number of mileage tickets in the anticipation of becoming insolvent, for if it were possible to sell them, the railroad commissioners, at any time, on application, would exclude it from the provisions of the act, and other railroads could not afterward be required to accept its mileage tickets, and the loss, if any, would fall on the purchasers of the tickets, whose contracts would be with it alone. The risk of loss from inability of one railroad to collect of another under mileage tickets taken from passengers seems to me too small to be seriously considered, and I regard the objections to the statute in this particular as theoretical and speculative rather than substantial or practical. It is a matter of common knowledge that every railroad does business on the credit of other railroads to a much larger amount than would ever be done under a statute of this kind; but suppose there is a possibility of trifling loss in a case which might arise under the statute, that does not render the statute unconstitutional. The question is rather whether there is a probability of losses so large as to make such a requirement plainly unjust and unreasonable, as an interference with the right " of acquiring, possessing, and protecting property." I think nobody can contend that there is such a probability. Moreover, the very idea of the exercise of the police power necessarily implies a greater or less interference with the acquisition, use, and enjoy-

ment of property. *Sawyer* v. *Davis*, 136 Mass. 239. *Miller* v. *Horton*, 152 Mass. 540. Every statute affecting property, enacted in the exercise of this power, illustrates the proposition. The reduction by the Legislature of fares upon railroads is an illustration which in my opinion touches much more closely the acquisition, possession, and protection of property, than does a requirement that railroads shall trust each other during short intervals for the payment of fares for which interchangeable tickets have been taken. In determining whether the statute is so unreasonable as to be against common right, real conditions and probable results, and not remote possibilities, are to be considered.

It will hardly be contended that every statute enacted for the regulation of the railroad business of the Commonwealth, which contemplates the giving of a short credit by one railroad company to another in the convenient transaction of their business, is for that reason unconstitutional. There are many general and special laws which require railroads to render services, to furnish station accommodations, and permit the use of tracks and the like to another corporation, for a reasonable compensation to be agreed upon, or, in the absence of agreement, to be fixed by the railroad commissioners. In many cases it would be difficult, if not impracticable, to provide for these payments in advance, and some at least of the statutes seem to contemplate that payments will be made upon short credits, as the practice is, after the services are rendered or the benefits received. Pub. Sts. c. 112, §§ 216–218. St. 1866, c. 126. St. 1871, c. 343. St. 1872, c. 180. Some of these statutes require the payment of rent for the use of a station built and owned by one railroad and used by others. The rent must either be paid in advance, or there must be some credit for it; it could hardly be paid daily. A requirement that the rent should be paid in advance would be quite as objectionable on constitutional grounds as a provision for a reasonable credit. The building might be destroyed, and the company that had paid rent in advance might get no equivalent for its payment. It seems to me that a regulation which may require a short credit for trifling sums, arising in the regular course of business between great corporations, most of which have property amounting to many millions of dollars in value, is not for that reason unconstitutional.

Similar considerations apply to the objection that the tickets are to be received by the different railroads in the state under like conditions.  It may be that in favor of the constitutionality of the law this language might be construed to mean something less than that the provisions of a contract in regard to the amount of baggage which may be carried, and the like, made by the railroad issuing the ticket, are to be applicable when the ticket is used on the railroad of another company; but if we assume in favor of the defendants that this is the meaning of the language, the difficulty does not seem to me great.  In the first place, it is a familiar fact that upon railroads generally there is no such difference in their contracts as to create any practical difficulty in issuing tickets to be used over many different lines of connecting railroads.  Everybody knows that one may buy, at any important railroad station in the State, a ticket to go thousands of miles over numerous railroads, whose owners will all receive the ticket under like terms and conditions.  The reasonableness and constitutionality of the statute are to be determined in view of the existing facts in the management of railroad business, and not in view of the legal possibility that some corporation would insert in its mileage ticket an unusual or absurd provision.  If such an unexpected event should occur, that would be a reason for the intervention of the railroad commissioners under the statute to relieve other corporations by excluding or exempting the railroad from the provisions of the act, and it would be in the power of the Legislature at the earliest opportunity to compel it to issue mileage tickets with reasonable provisions in regard to the transportation of baggage and other similar matters.  · No material harm could come to any person or corporation in the mean time.  In view of the way in which railroad corporations do their business, which must be presumed to have been known to the Legislature, and which must be considered in passing upon the statute, this objection, like the other, seems to me speculative and theoretical rather than real.  The statute in these two particulars, which are now made the ground of objection to it, conforms to the well known voluntary practice of railroad corporations in the transaction of similar business.

These objections would seem to be removable by a provision that each corporation shall deposit with the State Treasurer, or

with some other responsible officer, a sufficient fund to guarantee the redemption of all mileage tickets issued by it, and by a requirement that all mileage tickets shall be in a form prescribed by the Legislature; but if the statute contained such provisions, is it probable that the people of the Commonwealth or the railroad corporations would think it more reasonable, or better for practical operation, or more conducive to the best interests of the community? I am of opinion that the statute is a regulation of the business of the railroad corporations of the Commonwealth, which does not involve such probable loss from carrying passengers on credit, or such practical difficulty from the terms and conditions on which tickets would be issued, as to be an interference with the rights of those who undertake to do this public business, and I therefore think the statute constitutional.

I am authorized to say that Mr. Justice Holmes concurs in this opinion.