# RUGGLES *v.* ILLINOIS.

IN ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

Decided May 7th, 1883.

*Constitutional Law—Contracts—Illinois Railroads—Statutes.*

An amendment was made to the charter of a railroad company in Illinois providing that "the said company shall have power to make, ordain and establish all such by-laws, rules and regulations as may be deemed expedient and necessary to fulfil the purposes and carry into effect the provisions of this act, and for the well ordering, regulating and securing the affairs, business, and interest of the company : *Provided,* That the same be not repugnant to the Constitution and laws of the United States, or repugnant to

this act: The board of directors shall have power to establish such rates of toll for the conveyance of persons or property upon the same, as they shall from time to time by their by-laws determine, and to levy and collect the same for the use of the said company:" *Held*, That inasmuch as the power to establish rates was to be exercised through by-laws, and the power to make by-laws was restricted to such as should not be repugnant (among other things), to the laws of the State, the amendment did not release the company from restrictions upon the amount of rates contained in general and special statutes of the State.

Grants of immunity from legitimate governmental control are never to be presumed; unless an exemption is clearly established the legislature is free to act on all subjects within its general jurisdiction, as the public interests may require.

When there is an ambiguity in the language of a statute it may be necessary to inquire into the objects of the legislature in its enactment; or, if it be a private act, the purposes of the beneficiaries in asking for it; but when the language is clear, and needs no interpretation, and leads to no absurd conclusion, this will not be done.

Complaint before a justice of the peace in Illinois against Ruggles for assault and battery upon one Lewis. Lewis came on board a train on the Chicago, Burlington and Quincy Railroad without a ticket. He tendered Ruggles, the conductor, fare at the rate of three cents a mile. Ruggles refused to receive it and demanded the established rate of the company, which was more. Lewis not paying this, Ruggles attempted at the next station, but without violence, to remove him from the train. This was the alleged assault. Ruggles was convicted. The case was appealed until it reached the Supreme Court of the State, when the judgment was affirmed. The case came up on a writ of error, with the following certificate of the chief justice of the Supreme Court of Illinois:

"This certifies that in the determination of this case there was necessarily drawn in question the construction of that clause of the Constitution of the United States which prohibits a State from passing laws impairing the obligation of contracts. The plaintiff in error or appellant claimed that he was justified in the act for which he was prosecuted in the court below by the charters of the Chicago, Burlington and Quincy Railroad Company, he being a conductor on the railroad of said company, and that said charters conceded to said company the right to fix the rates for the

transportation of persons and property over and upon said road, and that said charters constituted a contract substantially guaranteed and protected by the Constitution of the United States ; and I certify that said claim was disallowed and decided adversely to the said appellant, by the said Supreme Court, upon the ground that by virtue of the provisions of a statute of the State of Illinois, passed subsequently to the granting of the charters of the said Chicago, Burlington and Quincy Railroad Company, a less rate of fare for transportation of persons and property upon said road had been established by State authority than the rate fixed by the company under the authority of its charter, and that said statute controlled the charter of the company in regard to the rates of transportation over and upon said road, and that the provisions of said charters granting to said company the right to fix the rates for the transportation of persons and property over its road did not constitute a contract protected by the Constitution of the United States, but was subject to alteration and modification by the legislature of Illinois, all of which is hereby duly certified, to the end that the said appellant may present the said question to the Supreme Court of the United States for adjudication."

*Mr. Wirt Dexter* and *Mr. Sidney Bartlett* for the plaintiff in error.

*Mr. James K. Edsall* and *Mr. James McCartney* for the defendants in error.

Mr. Chief Justice Waite delivered the opinion of the court.

In the view we take of this case, the only question that need be considered is, whether the charter of the Central Military Tract Railroad Company, one of the Illinois corporations which, through agreements of consolidation, are now represented by the Chicago, Burlington, and Quincy Railroad Company, purports on its face to grant to the company the right to fix the rates of fare and freight to be charged for the conveyance of persons and property on its railroad, free of all control by the State. If, on examination, we find that no such grant was intended, it will be unnecessary to decide whether one legislature has the power to bind succeeding legislatures by a contract to that effect.

The provisions of the charter relied on to establish such a grant may be stated as follows:

On the 5th of November, 1849, an act was passed by the general assembly of Illinois "to provide for a general system of railroad incorporations." That act contained the following provisions:

"§ 12. The directors of such company shall have power to make by-laws for the management and disposition of stock, property, and business affairs of such company, not inconsistent with the laws of this State, and prescribing the duties of officers, artificers, and servants that may be employed, for the appointment of all officers for carrying on all the business within the object and purposes of such company.

"§ 21. Every such corporation shall possess the general powers and be subject to the general liabilities and restrictions expressed in the special powers following, that is to say:

\*       \*       \*       \*       \*       \*       \*

"8. To take, transport, carry, and convey persons and property on their railroad, by the force and power of steam, of animals, or any mechanical powers, or by any combination of them, and receive tolls or compensation therefor.

\*       \*       \*       \*       \*       \*       \*

"10. To regulate the time and manner in which passengers and property shall be transported, and the tolls and compensation to be paid therefor; but such compensation for any passenger and his ordinary baggage shall not exceed three cents a mile, unless by special act of the legislature, and shall be subject to alteration as hereinafter provided.

\*       \*       \*       \*       \*       \*       \*

"§ 32. The legislature may, when any such railroad shall be opened for use, from time to time, alter or reduce the rates of toll, fare, freight, or other profits upon such road; but the same shall not, without the consent of the corporation, be so reduced as to produce with said profits less than fifteen per cent. per annum on the capital actually paid in; nor, unless on an examination of the amounts received and expended, to be made by the Secretary of State, he shall ascertain that the net income divided by the com-

pany from all sources for the year then last past shall have exceeded an annual income of fifteen per cent. upon the capital of the corporation actually paid in."

On the 15th of February, 1851, another act was passed to incorporate the Central Military Tract Railroad Company, for the purpose of building and using a railroad between certain designated points.   Section 3 of that act is as follows :

" § 3. The said company is hereby created and incorporated for the purpose of organizing under an act entitled ' An Act to provide for a general system of railroad incorporations,' in force November 5th, 1849, and in all things shall be governed by the provisions thereof, and shall be entitled to have and exercise the powers and privileges and be subject to the liabilities therein enumerated: *Provided*, That the foregoing corporation may attach themselves to and form a part of the Northern Cross Railroad Company, in such manner or on such terms as said companies shall agree."

On the 19th of June, 1852, another act was passed " to amend an act entitled ' An Act to incorporate the Central Military Tract. Railroad Company.'"    The following are the parts of this amending act on which, in our opinion, the case depends :

" § 5. All the corporate powers of said company shall be vested in and exercised by a board of directors, and such officers and agents as they shall appoint.   *    *    *    *

" § 6. The said company shall have power to make, ordain, and establish all such by-laws, rules and regulations as may be deemed expedient and necessary to fulfil the purposes and carry into effect the provisions of this act, and for the well ordering, regulating, and securing the affairs, business, and interest of the company : *Provided*, That the same be not repugnant to the Constitution and laws of the United States or of this State, or repugnant to this act.   The board of directors shall have power to establish such rates of toll for the conveyance of persons or property upon the same, as they shall from time to time by their by-laws determine, and to levy and collect the same for the use of the said company.   The transportation of persons and property, the width of track, and all other matters and things respect-

ing the use of said road, shall be in conformity to such rules and regulations as the said board of directors shall from time to time determine."

It is contended on the part of the company that this amending act repeals clause 10 of section 21 as well as section 32 of the general railroad law, so far as they are applicable to the Central Military Tract Company, and that under section 6 of the amending act the directors have absolute control of rates of fare and freight free of legislative interference. We deem it unnecessary to determine the question of repeal, because on full consideration we are satisfied that section 6 does not have the effect that is claimed for it.

Grants of immunity from legitimate governmental control are never to be presumed. On the contrary, the presumptions are all the other way, and unless an exemption is clearly established the legislature is free to act on all subjects within its general jurisdiction as the public interests may seem to require. As was said by Chief Justice Taney, speaking for the court, in *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 547; " It can never be assumed that the government intended to diminish its power of accomplishing the end for which it was created." This is an elementary principle.

In *Chicago, Burlington & Quincy Railroad Company* v. *Iowa*, 94 U. S. 155; *Peik* v. *Chicago & Northwestern Railway Company*, 94 U. S. 164; and *Winona & St. Peter Railroad Company* v. *Blake*, 94 U. S. 180, it was determined that " a State may limit the amount of charges by railroad companies for fares and freights, unless restrained by some contract in the charter." The right to a reversal of the present judgment rests on the question whether this company has any such restraining contract, and that depends on the effect to be given the amending section 6.

The company by its original charter was authorized to transport passengers and property and to receive compensation therefor. This, if there had been nothing more, would, under the rule stated in *Munn* v. *Illinois*, 94 U. S. 113, and the several railroad cases decided at the same time, require the

company to carry at reasonable rates, and leave the legislature at liberty to fix the maximum of what would be reasonable. So that, laying aside the limitations of the old charter, the question here is whether the amending section relied on has the effect of taking away from the State this power of legislative regulation.

The amending section provides that the company " shall have power to make, ordain, and establish all such by-laws, rules, and regulations as may be deemed expedient and necessary to fulfil the purposes and carry into effect the provisions of this act, and for the well ordering, regulating, and securing the affairs, business and interest of the company : *Provided*, That the same be not repugnant to the Constitution and laws of the United States, or of this State, or repugnant to this act." By section 5, all the powers of the company were vested in and could be exercised by the directors. Clearly under this authority no by-law can be established by the directors that does not conform to the laws of the State, and this, whether the laws were in force when the amended charter was granted or came into operation afterwards. The power of the company for the regulation of its own affairs was thus in express terms subjected to the legislative control of the State. The corporate power was a continuing one and intended for the ordering of the affairs of the company as circumstances might from time to time require. The reserved control by the State was also continuing in its nature, and manifestly intended for the protection of the public whenever in the judgment of the legislative department of the government the necessity should arise.

Then follows the special provision on which the claim of a contract is predicated. It is as follows :

" The board of directors shall have power to establish such rates of toll for the conveyance of persons or property upon the same as they shall from time to time *by their by-laws determine,* and to levy and collect the same for the use of the company."

This is the form in which the power to charge and collect compensation for the carriage of persons and property was

granted by the amended charter. The rates must be fixed by by-laws, and no by-law can be made that is at all repugnant to the laws of the State. The first paragraph of the section, with its proviso, prescribes generally what is necessary to the validity of a by-law, and the second allows the directors to fix rates by by-laws. It is undoubtedly true that the first paragraph neither adds to nor takes from the inherent power of a corporation to make by-laws for the regulation of its affairs, and that the proviso is nothing more than a legislative declaration of the principle of the common law that all by-laws must be reasonable, and not in conflict with the laws of the State. But the very fact that such a provision would have been implied, adds to the significance of its incorporation in express terms into the charter, and manifests a determination not to leave room for doubt as to the right of the State to use its legislative power if necessary for the regulation of the affairs of the corporation, at least by the enactment of general laws applicable to all corporations of a like·character, and engaged in a like business.  There is nothing which even in the remotest degree indicates that a by-law fixing rates is to be of a different character from those regulating the other business of the company.  When, therefore, in a section of the charter which expressly declares that no by-law shall be made that is in conflict with the laws of the State, we find that the rates of charge to be levied and collected for the conveyance of persons and property are to be regulated by by-laws, the conclusion is irresistible that only such charges can be collected as are allowed by the laws of the State.  This implies that, in the absence of direct legislation on the subject, the power of the directors over the rates is subject only to the common-law limitation of reasonableness, for in the absence of a statute, or other appropriate indication of the legislative will, the common law forms part of the laws of the State to which the corporate by-laws must conform.  But since, in the absence of some restraining contract, the State may establish a maximum of rates to be charged by railroad companies for the transportation of persons and property, it follows that when a maximum is so established the rates fixed by the directors must conform to its

requirements, otherwise the by-laws will be repugnant to the laws.

It is argued, however, that this cannot be the meaning of the amending act, because, if the company had, under its old charter, the absolute right of fixing rates, subject only to a limit of three cents a mile on passengers, and the State had no power to interfere, except to keep the annual profits down to fifteen per cent. per annum on the paid-up capital, no one can believe it would have surrendered such a privilege and taken in lieu another so unfavorable as this. It is undoubtedly true, as was claimed in argument, and has been often said from the bench, that amendments to the charters of corporations are usually made at the solicitation of the corporations themselves, who cause the bills to be prepared and submitted to the legislatures for enactment, and that, if there is doubt as to the construction of what is enacted, this fact may be resorted to in aid of interpretation. But Vattel's first general maxim of interpretation is that "it is not allowable to interpret what has no need of interpretation," and he continues : "When a deed is worded in clear and precise terms—when its meaning is evident and leads to no absurd conclusion—there can be no reason for refusing to admit the meaning which such deed naturally presents. To go elsewhere in search of conjectures, in order to restrict or extend it, is but to elude it." Vattel's Law of Nations, 244. Here the words are plain and interpret themselves. The directors may establish such by-laws as they please, provided they are not repugnant to the Constitution and laws, and they may by their by-laws regulate the rates of fare and freight. As their by-laws must conform to the laws of the State, so must their rates. If the State had not the legislative power to regulate the charges of carriers for hire, the case would be different. But that question has been settled, and the amended charter which this company secured from the legislature must be construed in the light of that established power.

Without, therefore, undertaking to determine what rights as to fares and freights were secured to the company under the old charter, nor whether more was gained by the other pro-

visions of the new charter than was lost by the acceptance of section six as it was enacted,

*We affirm the judgment.*

MR. JUSTICE HARLAN concurring.

In *Munn* v. *Illinois,* 94 U. S. 113, this court held that there was nothing in the Constitution of the United States which prevented the legislature of Illinois from fixing, by statute, the maximum of charges for the storage of grain in warehouses at Chicago and other places in that State, where grain is stored in bulk, and in which the grain of different owners is mixed together, or in which the grain is stored in such a manner that the identity of different lots or parcels cannot be accurately preserved.

Immediately following that case is *Chicago, Burlington & Quincy Railroad Company* v. *Iowa,* 94 U. S. 155, which involved the validity of a statute of Iowa establishing "reasonable maximum rates of charges for the transportation of freights and passengers" on the different railroads of that State. Touching that case it may be observed that the court conceded that a railroad corporation might be protected by its charter against absolute legislative control as to rates of fare and freight, but that the power of the corporation which there questioned the validity of the law of Iowa was, by its charter, made subject to such legislation as the legislature might, from time to time, establish.

"They [railroad corporations] are, therefore," said the court, "engaged in public employment affecting the public interest, and, under the decision in *Munn* v. *Illinois,* subject to legislative control, *unless protected by their charters.* The Burlington & Missouri River Railroad Company, the benefit of whose charter the Chicago, Burlington & Quincy Railroad Company now claims, was organized under the general corporation law of Iowa, with power to contract, in reference to its business, the same as private individuals, and to establish by-laws and make all rules and regulations deemed expedient in relation to its affairs, but being *subject, nevertheless, at all times, to such rules and regulations as the general assembly of Iowa might, from time to time, enact*

*and provide.* This is, in substance, its charter, and to that extent
it is protected *as by a contract;* for it is now too late to contend
that the charter of a corporation is not a contract within the mean-
ing of that clause in the Constitution of the United States which
prohibits a State from passing any law impairing the obligation of
a contract. Whatever is granted is secured subject only to the
limitations and reservations in the charter, or in the laws or con-
stitutions which govern it."

In *Peik* v. *Chicago & Northwestern Railway Company,* 94
U. S. 164, a similar statute of Wisconsin was sustained as
within the power of its legislature to enact. The court said:

"In *Munn* v. *Illinois* and *Chicago, Burlington & Quincy
Railroad Company* v. *Iowa,* we decided that the State may limit
the amount of charges by railroad companies for fares and
freight, *unless restrained by some contract,* even though their in-
come may have been pledged as security for the payment of obli-
gations incurred upon the faith of the charter "

It was also said in that case:

"When property has been clothed with a public interest, the
legislature may fix a limit to that which shall, in law, be reason-
able for its use. This limit binds the courts as well as the
people."

The language last quoted, it must not be overlooked, was
used in reference to a railroad charter granted under the Con-
stitution of Wisconsin, which expressly provided that all acts
for the creation of corporations within the State "may be
altered or repealed by the legislature at any time after their
passage."

In *Winona & St. Peter Railroad Company* v. *Blake,* 94 U.
S. 180, it was decided that, as there was nothing in the charter
of the railroad company limiting the power of the State to
regulate charges for freight and passengers, it was competent
for the legislature to require the company to carry on equal and
reasonable terms; this, because, as the court ruled, it was inci-
dent to the occupation in which the corporation was engaged,

and for which it was created a carrier, to collect only a reasonable compensation for carriage. The act was there held as adding nothing to, and taking nothing from the grant as contained in the original charter.

These cases establish, among others, these principles: 1. That the charter of a railroad corporation is a contract within the meaning of the contract clause of the federal Constitution. 2. That such corporation may be protected by its charter against absolute legislative control in the matter of rates for the carriage of passengers and freight. 3. That when the charter is granted subject to such regulations as the legislature from time to time may provide, or subject to the authority of the legislature to alter or repeal it, in either of such cases the legislature has the same power over rates or tolls that it had when the charter was granted. 4. In the absence of statutory regulations upon the subject, it is necessarily implied from the occupation of a railroad corporation that it shall exact only reasonable compensation for carriage.

How far these principles control the present case I proceed now to inquire.

The general railroad law of 1849 authorized railroad corporations created under it to regulate tolls and compensation for the transportation of passengers and property, subject to these restrictions: That compensation for a passenger and his ordinary baggage should not exceed three cents a mile, unless by special act of the legislature; further, that the legislature may, from time to time, alter or reduce the rates of toll, fare, freight, or other profits upon such railroad, provided the same should not, without the consent of the corporation, be so reduced as to produce with said profits less than fifteen per cent. per annum on the capital actually paid in, nor, unless on an examination of the amounts received and expended, to be made by the Secretary of State, he shall ascertain that the net income derived by the company from all sources for the year then last passed exceeded an annual income of fifteen per cent. upon the capital so actually paid in.

The act of February 15th, 1851, incorporating the Central Military Tract Railroad Company—one of the constituent cor-

porations which, by consolidation, make the Chicago, Burlington and Quincy Railroad Company, and to the benefit of whose charter the latter is entitled—declares that it is created for the purpose of organizing under the general law of 1849, " and in all things shall be governed by the provisions thereof, and shall be entitled to have and exercise the powers and privileges and be subject to the liabilities therein enumerated." The provisions of the act of 1849, enumerating the powers and privileges to be enjoyed by, and the liabilities imposed upon, corporations organized thereunder, thus became a part of the charter of the Central Military Tract Railroad Company.

If the determination of this case turned solely upon the question whether the act of 1871 establishing maximum charges for all railroads in Illinois, deprived this company of any contract right declared or given by the law of 1849, there would be no difficulty in affirming the judgment ; for, in the first place, the amount tendered, in this case, to conductor Ruggles, and which he refused to accept as the entire compensation to be paid by Lewis, the passenger, was all that was allowed by the act of 1871, and all that the company, in the absence of a special act, was permitted by the law of 1849 to collect; further, there is no evidence in the record that the passenger rates as established by the act of 1871, will reduce the profits of the company below the aggregate amount which by its charter it was entitled to realize, and within which the legislature, by express reservation, could restrict it. But in behalf of appellant it is contended that by the sixth section of the act of June 19th, 1852, the corporation was invested with absolute control, through its directors, of the whole subject of rates ; in other words, that the legislature, in that section, removed the restriction in the act of 1849 of three cents per mile for a passenger and his ordinary baggage, and, by necessary implication, surrendered its power to make even the reduction provided for in that statute.

In this view, as to the construction of the act of 1852, I do not concur. That act is not absolutely inconsistent, upon the subject of rates, with the general statute of 1849. They may stand together, and since repeals by implication are not favored,

they should be so construed as, if possible, to make them both operative. The statute of 1849 gave the corporation the general power, within a certain limit, of regulating tolls and compensation to be paid for the transportation of passengers and property. But it did not prescribe the particular mode by which the public should be informed as to the rates established. I incline to think that the purpose of the act of 1852 was to declare, as a condition precedent to power in the directors to levy and collect tolls, that the rates should not be determined at the mere discretion of the company's superintendent or agents charged with the management of its business, but—keeping within the limits prescribed by the law of 1849—should be fixed by the directors in the by-laws of the corporation. · It should not be presumed that the legislature intended by the general language of the act of 1852 to abrogate the restrictions in the act of 1849, and to surrender, as to the Central Military Tract Railroad Company, the power, reserved in the general law, of keeping the profits of all railroad corporations created under it, as that one was, within fifteen per cent. upon the capital actually paid in.

But I do not concur in so much of the opinion of the court as seems to rest upon the ground that, apart from the law of 1849, the question of tolls to be charged by the Central Military Tract Railroad Company was, under the act of 1852, exclusively for legislative determination, and, in no case, of judicial cognizance. The court holds that, testing the right of the company entirely by the latter act—in other words, assuming that the sixth section of the act of 1852 superseded all in the act of 1849 upon the subject of rates—the judiciary may not inquire whether the rates established by the legislature are less than reasonable compensation for the carriage of persons and property; that is, that the legislative determination is conclusive. I concede that the sixth section of the act of 1852 does not place the subject of rates within the absolute control of the company, so as to authorize it to levy and collect tolls beyond what would afford proper remuneration for the services rendered; this, because, as already shown, the law implies, as incident to its business, that the company shall exact only

reasonable tolls. But the legislature, by the sixth section of the act of 1852, agreed that the *directors* might levy and collect such reasonable rates as *they* should, from time to time, establish by their by-laws. The introduction into that section of the special clause relating to rates, after and in connection with the general clause conferring power to make by-laws, rules and regulations, in reference to the affairs, business and interest of the company, not inconsistent with the laws of the State, was entirely unnecessary, and is meaningless, if not intended to assure those who put their means into the proposed road, that, as to the tolls to be levied and collected, they should be established by the directors within the limit of reasonableness, and not left to the uncontrolled discretion of the legislature. In other words, the company has—putting aside the general law of 1849—a contract with the State that it may, by its directors, establish, levy, and *collect* reasonable tolls. The court holds, erroneously, as I think, that no contract, in any view of the case, arises out of the act of 1852, and that, consistently with its provisions, the judiciary cannot inquire whether the rates established by the board of directors are or are not reasonable. Although the rates fixed by the legislature may be shown to be ruinously low, the judiciary cannot, according to the decision of the court, protect the company in the exercise of the power granted to it of establishing, levying, and collecting reasonable tolls.

I am of opinion that if the act of 1852 is to be regarded either alone or as superseding the law of 1849, it constitutes a contract between the State and the company, whereby the latter acquired an exemption from absolute legislative control as to rates, and secured, beyond the power of the legislature to withdraw, the right, through its directors, from time to time, within the limit of reasonableness, to establish rates of toll for the transportation of persons and property. If this be so, it results that all controversies involving rights under this contract must be adjusted, as in all other cases of contract, in the courts according to the established principles of law, and are not determinable by, or wholly dependent upon, the will of one of the parties. The company, or any one acting by its authority,

has the right to submit to the courts the question whether rates prescribed by any subsequent act of the legislature will give that reasonable compensation which the State agreed, in the act of 1852, might be exacted by the company under by-laws established by its board of directors.

The act of 1852 does not, I think, supersede the provisions of the general law of 1849 upon the subject of rates. But since the company (if we look alone to the act of 1852) has failed to show that the rates fixed in the act of 1871 are unreasonable, and since—if the thirty-second section of the act of 1849 is still in force—it does not appear that those rates would reduce the company's profits below the amount to which, by that section, they could be restricted by subsequent legislation, I concur in affirming the judgment.

FIELD, J.—I concur in the judgment in this case solely on the ground that no proof was made that the rate prescribed by the legislature was unreasonable. Under previous decisions of the court the legislative rate is to be taken as presumptively reasonable.

I do not give any weight to *Munn* v. *Illinois.* My objections to the decision in that case were expressed at the time it was rendered, and they have been strengthened by subsequent reflection. Besides, that case does not relate to corporations or to common carriers.

MR. JUSTICE BLATCHFORD did not sit in this case.