## MATTHEWS v. BOARD OF CORP. COM'RS OF NORTH CAROLINA et al.

(Circuit Court, E. D. North Carolina. February 5, 1901.)

1. CARRIERS—FREIGHT RATES—STATE COMMISSION—REASONABLENESS.

If railroad freight rates fixed by a state corporation commission are so low that they compel the railroad to conduct its operations at a loss or without a fair remuneration for its investment, then the property of the company is taken for public use without just compensation, and the rates are unreasonable and void.

2. SAME—ESTIMATE—RULE.

In estimating the value of a railroad company's property for the purpose of determining whether freight rates fixed by a state corporation commission are so unreasonably low as to amount to a taking of the company's property without due process of law, when by charging such rates the company cannot obtain a fair return on its property, such property must be estimated at its present value, and its cost, past or probable future value, or the cost to duplicate it are immaterial.

3. SAME—FERTILIZER RATES—REASONABLENESS.

Where, in a proceeding to set aside an order of a state corporation commission fixing freight rates on fertilizers, a special commissioner was unable to determine the exact cost of transportation, but found that, though the rate fixed decreased the profit arising from such transportation, there was still a profit, and that for four years preceding the railroad company had earned a fair net profit on the present value of its property, a finding that the rates were not unreasonably low was not erroneous.

4. SAME—CAR-LOAD RATE—ESTABLISHMENT—ACQUIESCENCE.

Where an order of a state corporation commission fixing the amount of fertilizers which should constitute a car load, in order to entitle the shipper to car-load rates, at 10 tons, was binding on all the railroad companies in the state, and the vast majority of such companies acquiesced therein, and the amount so fixed had been the amount fixed for several years prior to a change, it could not be said that such amount was unreasonable.

In Equity.

For former report, see 97 Fed. 400.

W. H. Day, for complainant.

R. H. Battle, for defendants.

SIMONTON, Circuit Judge. This case comes up on the report of the special master and exceptions thereto. The North Carolina Corporation Commission, the successor to, or more properly the substitute for, the board of railroad commissioners established in 1891, exercising the powers conferred upon it by the legislature, has prescribed certain rates for the carriage of passengers and freight for all the railroads of the state. The railroad commission, recognizing the difficulties under which the Carolina Central Railway Company was laboring, had authorized it to add 30 per cent. increase to the standard rates. This concession has been continued by the corporation commission, with the single exception of rates on fertilizers. The history of the rates on fertilizers is this: From 1891 to 1896, in fixing the rates for fertilizers on all the roads of the state the minimum car load was placed at 10 tons. In 1896 the railroad commission issued an order that the Carolina Central shall use the same rates as the Cape Fear & Yadkin Valley Railroad Company. In the tariff for this last-named road the minimum car load of fertilizers was

fixed at 15 tons. On the 27th April, 1899, the corporation commission repealed all former rates on fertilizers, making the same rates applicable to all railroads, and changing the minimum car load from 15 to 10 tons. The two circulars—that for the Cape Fear & Yadkin Valley road and the last circular of the corporation commission—are appended to the report of the master as exhibits. The decrease in rates is in some cases 20 cents, in others 30 cents, per ton. Of this diminution of rates complainant complains. The question is, are the rates here fixed unreasonable? The special master to whom the case was referred took all the testimony which was offered to him, and diligently prosecuted the inquiry into the matters referred. He has filed a report which gives marked evidence of the care and industry which he bestowed upon the case, and of the learning and ability which he brought to bear upon it. He reached the conclusion, and so reports, that the rates prescribed for fertilizers to the Carolina Railway Company in this circular of 27th April, 1899, are not unreasonable, either in the rate per ton, or in fixing the minimum car load at 10 tons. The exceptions to this report are numerous, covering nearly every finding of fact reported by the master, and challenging the conclusion reached by him.

The questions made in this case are federal questions, and grow out of the fourteenth amendment. If the rates fixed are unreasonable,—that is to say, if they compel the railway company to conduct its operations at a loss or without a fair remuneration for its investment,—then the property of the company is taken and used by the public without just compensation, and it is deprived of its property without due process of law. The jurisdiction of this court depends on the federal question. It is its duty, as it is the duty of all courts, state and federal, to see to it that no right secured by the supreme law of the land is impaired by legislation acting directly on the subject, or through agents created by legislation. The law applicable to this case has been settled by a series of decisions of the supreme court of the United States. One of the latest of these decisions (Smyth v. Ames, 169 U. S. 467, 18 Sup. Ct. 418, 42 L. Ed. 819) announces the doctrine:

"A railroad is a public highway, and none the less so because constructed and maintained through the agency of a corporation deriving its existence and powers from the state. Such a corporation was created for public purposes. It performs the function of the state. Its authority to exercise the right of eminent domain and to charge tolls was given primarily for the benefit of the public. It is, therefore, under governmental control, subject, of course, to the constitutional guaranty for the protection of property. It may not fix its rates solely with a view to its own interests, and ignore the rights of the public. But the rights of the public would be ignored if rates for transportation of persons or property on a railroad were exacted without reference to a fair value of the property used for the public, or of the services rendered, and in order simply that the corporation may meet its operating expenses, pay interest on its bonds, and declare dividends to its stockholders."

On the other hand, the public cannot require the corporation to use its plant, its money, and its credit without remuneration. Smyth v. Ames, supra; Turnpike Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560; Chicago, M. & St. P. Ry. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970; Railway Co. v. Smith, 173 U.

S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858. The best interests of the public forbid this. Railroads are the arteries of trade. Through them flows the life blood of a community. The best statesmanship contributes to their maintenance and encourages their prosperity. What the remuneration shall be depends upon the circumstances of each case. Investments may be made in railroads, as in any species of property, so unwise as never to be remunerative. As was said in Covington Turnpike Case, supra, "it cannot be said that a corporation is entitled as of right, and without reference to the interests of the public, to realize a given per cent. on its capital stock." A fortiori, a corporation cannot be entitled to compel the public to make profitable an investment which was unwisely inaugurated and badly executed. The basis of all calculations as to the reasonableness of rates is the fair value of the property used for the convenience of the public,—not its cost, nor the amount of money expended upon it, but its value as a producing factor, taking into consideration its location, character of the country through which it passes, and the reasonable expectation of business coming to it. The railroad company is entitled to a fair return upon the value of the property, ascertained in this way, and it is not entitled to exact from the public more than this. To this question, so difficult in its solution, and so often, after the best effort, unsatisfactory in its result, the special master devoted much consideration. He puts the value of the railroad property a little below, and calls it, in round numbers, $3,000,000. It may have—indeed, probably has—cost more than this. But, in estimating the value of the property, we must take, not what was its value in the past, nor what it cost, nor what it would cost to duplicate it, nor its probable future value, but the estimate must be based on its present value. San Diego Land & Town Co. v. City of National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154. The conclusion of the special master coincides with the estimate of Mr. Shaw, the treasurer of the Seaboard Air Line, the owner of the road. Assuming this to be the value of the property, the history of the company shows that in 1891 its gross earnings paid operating expenses, interest on the debts, all fixed charges, taxes, with all proper deductions for income, and left a net income over all applicable to dividends on the stock. In 1892, 1893, 1894, and 1895 the gross earnings were in each year insufficient to meet the demands upon it, and in each year there was a deficit. In 1896, 1897, 1898, and 1899 the gross earnings paid all prior charges upon them, and had a net surplus applicable to dividends on stock. These are the figures for these last four years: 1896, net income $159,-833.49, or 5.327 per cent. of $3,000,000; 1897, net income $113,-720.71, or 3.790 per cent. of $3,000,000; 1898, net income $155,-782.60, or 5.189 per cent. of $3,000,000; 1899, net income $139,-272.91, or 4.64 per cent. of $3,000,000. In estimating the percentage on year 1899, the master first deducts from income for loss by reason of decrease of rates under circular No. 1. It is said, however, that the net profits of the good years should be appropriated to make good the losses of the bad years. But it must be remembered that these bad years from 1891 to 1895 were years of panic and general

depression. All investments of every character suffered. The grant of a charter to a railroad company does not guaranty that it will or can make the investment at all times a paying one. A corporation is not entitled, as of right, and without reference to the interests of the public, to realize a given per cent. on its capital stock. Turnpike Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560. The special master made an exhaustive examination into the question whether there was a profit in the rates fixed for handling fertilizers. There were great and perhaps inherent difficulties in reaching a positive conclusion. He sought aid from the railroad agents, but from their system of accounts neither he nor they could ascertain the cost of transporting fertilizers by the ton. He was driven to inference, and he concluded that there was a decrease of profit under circular No. 1, but nevertheless there was profit. In this connection, it must be borne in mind that the supreme court of the United States, in deciding whether the rates fixed under legislative authority violated the fourteenth amendment, do not rest their judgment on one set of rates for specific articles, but they take into consideration all the rates on all articles, and decide whether, as a whole, the result is unreasonable (Smyth v. Ames, 171 U. S. 361, 18 Sup. Ct. 888, 43 L. Ed. 197), and also that, in examining rates fixed by a commission, they must be taken presumptively as reasonable (Field, J., in Ruggles v. Illinois, 108 U. S. 541, 2 Sup. Ct. 832, 27 L. Ed. 812). Indeed, the opinion delivered for the court in San Diego Land & Town Co. v. City of National City, 174 U. S. 750, 19 Sup. Ct. 808, 43 L. Ed. 1158, goes very far. In it is quoted with approval the opinion of the supreme court of California in Spring Valley Waterworks v. City of San Francisco, 82 Cal. 286, 22 Pac. 910, 1046, in these words:

"When the constitution provides for the fixing of rates or compensation, it means reasonable rates and just compensation. To fix such rates and compensation is the duty and within the jurisdiction of the board. To fix rates not reasonable, or compensation not just, is a plain violation of duty. But the courts cannot, after the board has fully and fairly investigated, and acted by fixing what it believes to be reasonable rates, step in and say its action shall be set aside and nullified because the court, upon similar investigation, have come to a different conclusion as to the reasonableness of the rates fixed. There must be actual fraud in the fixing the rates, or they must be so palpably and grossly unreasonable and unjust as to amount to the same thing."

This is a quotation by the judge delivering his opinion, and may perhaps be treated as his argument, rather than an authoritative deliverance of the court. We are not disposed to go to the length the California court does. But, at the least, it shows that, before the rate fixed by the commission is pronounced unreasonable, the result of fixing the rate must be clearly unreasonable. It is said, however, that the regulation fixing the minimum car load at 10 tons is unreasonable. This regulation applies to all the railroads in the state, and it was in existence for many years. For a year or two it was raised to 15 tons, and now has been restored. It is said that this is a discrimination against those who ship less than 10 tons, and in favor of the large consumers. But the complaint is

not against the fixing of the limit for a car load, but against fixing it at 10 tons. The commission was of opinion that some limit should be fixed. The acquiescence of the vast majority of the railroad companies would seem to show that this in itself was not unreasonable. If the minimum rate had to be fixed at some point, there would, of necessity, be some discrimination of the kind suggested. Were it fixed at 15 tons, all those who ship less than 15 tons would be at a disadvantage. Naturally, their number would be greater than if the minimum was 10 tons, and still greater if it was fixed at 20 tons. Counsel rely on Railroad Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858. In that case the legislature of Michigan passed an act compelling railroad companies to issue 1,000-mile tickets at a certain reduced rate, to be effectual for a certain time, to be redeemable within that time, and to be used by the whole family of the purchaser. This was held an unwarrantable interference with the business of the railroad companies, compelling them to discriminate between classes of persons. It is not denied that the companies, in conducting their own business, and of their own motion, could issue such tickets. They could not be compelled to do it. No such effort is made in the case at bar. The car load is regulated. The company if it wishes, can charge less per ton if the whole car load be shipped than it would charge on the single ton for less than a car load. But this is wholly within its option.

The reasoning and conclusions of the special master are perfectly satisfactory. The exceptions are overruled, and the report is confirmed.