# CASES DETERMINED

IN THE

# SUPREME COURT OF NEBRASKA

AT

## SEPTEMBER TERM, 1909.

STATE OF NEBRASKA v. ADAMS EXPRESS COMPANY.*

FILED SEPTEMBER 25, 1909. No. 15,310.

1. **Constitutional Law: EXPRESS RATES: VALIDITY OF STATUTE: BURDEN OF PROOF.** Statutes fixing maximum rates which corporations, joint-stock companies or persons whose property is devoted to public use may charge and receive as compensation for their services are presumed to be constitutional; and the burden of proof is on one who challenges their validity to show by a preponderance of the evidence that the legislation complained of clearly contravenes some provision of the constitution.

2. ———: ———: ———: ———. When an attempt is made to strike down a rate statute, it is incumbent on the attacking party to make full, fair and complete disclosure of all of the revenue derived from the business, and the disbursement of the same for all purposes, including salaries paid to all of its officers, agents and employees, so that it may be determined whether such salaries and expenditures are necessary as well as reasonable in amount.

3. ———: ———: ———: ———. Before the courts are called upon to adjudge an act of the legislature fixing maximum rates for express companies unconstitutional on the ground that they are unreasonable and confiscatory, they should be fully advised as to what is done with the receipts and earnings of the company; for, if so advised, it might clearly appear that a prudent and honest management within the rates prescribed would secure to the company a reasonable compensation for the use of its property and for conducting its business.

4. ———: ———: ———. A court of equity ought not to interfere

* See *State v. Pacific Express Co.*, 80 Neb. 823.

(25)

with and strike down an act of the legislature fixing maximum express rates, before a fair trial has been made of continuing the business thereunder, and in advance of any actual experience of the practical result of such rates.

5. ———: ———: ———. Where it reasonably appears from a consideration of all the evidence that the rates complained of are not confiscatory, but afford the express company at least some measure of profit for carrying on its business, the courts will not interfere with the operation of the statute, but will require the party complaining to apply for relief to the rate-making power or the tribunal provided by the statute with power to increase such rates, if they are alleged to be unreasonable.

6. ———: ———: ———. A rate statute will not be declared unconstitutional on the ground that it provides drastic penalties for its violation, unless it appears that the penalty clause was the inducement for its passage, and, with that clause eliminated, the remainder of the act is incomplete and incapable of enforcement.

ORIGINAL action by the state to enjoin defendant from putting into effect charges or rates other than those established by law. *Judgment for state.*

*William T. Thompson, Attorney General,* for plaintiff.

*Charles J. Greene* and *Ralph W. Breckenridge, contra.*

BARNES, J.

This is an action in equity by which the state of Nebraska, as plaintiff, has invoked the original jurisdiction of this court to enjoin the defendant (the Adams Express Company) from charging or receiving for services between places in Nebraska any sum in excess of 75 per cent. of certain charges exacted by defendant under its schedule of rates in force on the 1st day of January, 1907. The reduction of rates in question was sought to be accomplished by an act of the legislative assembly of that year (laws 1907, ch. 91), which reads as follows:

"Section 1. All persons, associations or corporations engaged in the transportation of money or merchandise for a money consideration in cars other than freight cars

and on trains other than freight trains shall be deemed an express company within the meaning of this act.

"Section 2. Within thirty days after the passage and approval of this act, all express companies doing business in this state shall file with the railway commission a complete schedule of the rates and classifications charged for the transportation of money or merchandise within this state by such company, which was in force on the first day of January, A. D. 1907.

"Section 3. Express companies may charge and receive for the transportation of merchandise within the state of Nebraska any sum not exceeding seventy-five per cent. of the rate as shown in the schedule provided for in section 2 of this act until after the state railway commission shall have provided a greater rate.

"Section 4. Provided that nothing in this act shall be construed to change the prepaid rates on merchandise weighing one (1) pound or less, and provided further, that no provision of this act shall reduce any special contract rate in force for the transportation of cream, milk or poultry or any charge to a sum less than fifteen cents; and provided further, that nothing in this act shall abridge the authority of the railroad commission to make a reduction in any rate provided for in this act.

"Section 5. If any express company should fail to comply with the provisions and conditions of this act, they shall be fined on conviction a sum not less than ten dollars or more than one thousand for each offense.

"Section 6. The Nebraska state railroad commission, and if there be no commission, then the governor with the assistance of the attorney general, are hereby empowered to enforce the provisions of this act."

The act above quoted was passed by the legislature in the exercise of the power of the state to regulate defendant as a common carrier of express matter or articles of commerce between places in Nebraska. Defendant threatened to disobey the law, to prevent the state from controlling its internal commerce on defend-

ant's lines of transportation between places in Nebraska, and to charge and collect for intrastate services compensation in excess of the maximum rates fixed by the legislature. The attorney general thereupon commenced this action and obtained a restraining order preventing the defendant from carrying out its threat of disobedience. Early in the history of the litigation defendant challenged the jurisdiction of the court, and filed a petition and bond for removal. The record was thereupon lodged in the circuit court of the United States for the federal district of Nebraska, where the defendant was unable to sustain its contention, and the cause was remanded to this court. On proper pleas, and after a full hearing, the jurisdiction of the court and the right of the state to maintain the action were sustained. *State v. Adams Express Co.*, 80 Neb. 840; *State v. Pacific Express Co.*, 80 Neb. 823. Having finally adjudicated those questions, they will not again be referred to in this opinion.

After the settlement of the preliminary questions the defendant filed its answer, alleging, among other things: First, that a horizontal cut of 25 per cent. of its rates was impractical and unreasonable; that the rates thus fixed by the statute are confiscatory; that the defendant is thereby deprived of its right to a reasonable profit on its business and its property investment, and therefore the act is unconstitutional; second, that the penalties provided by the act for a violation of its provisions are so unreasonable, excessive and drastic as to prevent the defendant from securing a judicial inquiry into the validity of the statute without incurring a prohibitive risk, and that they therefore constitute a violation of the equality clause of the fourteenth amendment of the federal constitution. The allegations of the answer were controverted by a reply, and after the issues were thus joined the Honorable John J. Sullivan was appointed as a referee to take and report the evidence, together with his conclusions of facts and law, to the court, with all convenient speed. A large amount of

testimony was taken, which is now before us, together with the referee's report. His findings of facts were generally for the plaintiff, and his conclusions of law are as follows: "My conclusions of law are: First, that the Sibley act (which is the statute in question), so far as it affects the business of the Adams Express Company, is not confiscatory; second, that judgment on the merits should be rendered in favor of the state and against the defendant company." To this report the defendant has filed exceptions so voluminous that to quote them would extend this opinion to an unreasonable length; but such of them as are necessary to a correct disposition of the case, together with the particular findings of fact to which they refer, will be noticed, considered and decided under proper subdivisions. The case has been argued and submitted on its merits, and therefore, if the report of the referee is sustained, judgment must be entered for the state; while, on the other hand, if the exceptions are allowed, we may make such disposition of the case as we think the evidence requires.

Defendant first excepts to the report as a whole, and particularly to the findings of fact contained therein, "Because the same are not sustained by the evidence." The determination of the question thus raised requires a careful examination of the testimony taken by the referee. In making the investigation we start with the presumption that the statute in question is a valid and constitutional exercise of legislative power. *Reagan v. Farmers Loan & Trust Co.*, 154 U. S. 362, 395; *Ex parte Young*, 209 U. S. 123. The concurring opinion of Field, J., in *Ruggles v. Illinois*, 108 U. S. 526, 541; *State v. Fremont, E. & M. V. R. Co.*, 22 Neb. 313; *Davis v. State*, 51 Neb. 301. In the case last cited the rule is well stated as follows: "Every legislative act comes before this court surrounded with the presumption of constitutionality, and this presumption continues until the act under review clearly appears to contravene some provision of the constitution." This rule places the burden of proof on the

defendant, and before we can strike down the statute it must show by a preponderance of the evidence that the rates' fixed thereby are so low as to be clearly confiscatory. *Chicago, M. & St. P. R. Co. v. Tompkins,* 176 U. S. 167; *Ex parte Young, supra.*

The facts of this case, which are not in dispute, are that the defendant is a common carrier. It operates in 28 states and upon 34,862 miles of railroad and other lines of transportation. It is not incorporated, but is a joint-stock company. It has a capital stock of $12,000,000, divided into 120,000 shares, which are owned by 2,700 shareholders, whose identity is not disclosed. The territory in which it operates is divided into three departments. The western department, which includes Nebraska, is operated over 18,652 miles of transportation lines. The Nebraska mileage, all of which is upon the Burlington lines, is 2,514 miles. The company has 272 offices in this state, and about 450 employees. The value of the property employed in carrying on its entire business is not disclosed, but the estimated value of the portion devoted to the service in Nebraska is between $50,-000 and $60,000. The gross revenues of the company upon all of its lines for the year ending December 31, 1907, were $27,822,738.23. Its operating expenses for the same period were $27,356,345.17, leaving a net profit of $466,393, or 1.6 per cent. of the gross receipts.

Assuming the burden of proof above mentioned as to the remaining facts, the defendant produced as witness Mr. Glenn, the auditor of the western department, and Mr. Waters, the general auditor of the company, and, as a summary of their evidence, has placed in the record its exhibit 5. This, after having been revised by counsel to correct errors, shows that the business of the company in this state for the year ending December 31, 1907, resulted in a net income of $12,689.94. Those witnesses were afterwards recalled, and an attempt was made to show by them that the terminal expenses properly chargeable to Nebraska business would reduce the net earnings

of the company for the year 1907 to approximately $8,-216.03. The plaintiff, however, challenges the truth of this evidence, and claims by its construction of exhibit 5 that the net earnings of the defendant in this state for the year 1907 were in fact $14,336.29, or approximately 5 1-6 per cent. of its gross earnings. It will be observed by an examination of the original exhibit 5 that the defendant has built up an estimate of what it conjectures would have been the result on the business of 1907 had the statute in question then been in effect. By assuming that there would have been no increase in the business, that all of the general expenses and office salaries would have remained exactly the same, defendant contends that it would have lost $14,812.65 on the business of that year. In this calculation, however, no account has been taken of the money-order business, and it has been assumed that only $15,000 of the total revenue would have been unaffected by the rate reduction. It is further assumed that the new rate would not have added anything whatever to the gross revenue of the company. It is also erroneously claimed that the expenses would not be reduced or affected by reason of the reduction in rates. Again, it appears that the defendant made no deduction from the expenses charged to the Nebraska business for that portion of the general expense which it incurred in conducting its through business, business which neither originated nor terminated in Nebraska, and which is called its overhead business. By these devices the defendant has attempted to show that, if the statutory rates were in force for the year 1908, it would lose on its Nebraska intrastate business $15,812.65.

It may be conceded that by loading the Nebraska intrastate business with a sufficient amount of so-called terminal expenses, together with a proportionate amount of the expenses of administration, it is possible to show that the Nebraska business for 1907 was conducted at a loss, which loss would be increased for the year 1908; but the evidence introduced for that purpose is not con-

vincing. It must be borne in mind that prior to the passage of the Sibley act the defendant had, with a free hand, made its own rates and charges, and it is not to be believed that it had voluntarily made a rate under which it had been conducting its Nebraska business without profit for more than a generation. The findings of the referee that the defendant's business in Nebraska for the year 1907 was remunerative seems to be warranted by the evidence, accords with sound reason, and is therefore sustained.

Coming now to a consideration of defendant's Nebraska intrastate business for the year 1908, we find that the company has introduced in evidence a statement of its transactions for the month of June of that year, which it has used as a basis of its claim or contention that the rates fixed by the statute are confiscatory. We are of opinion, however, that this evidence does not furnish a satisfactory test of the effect of the act, and is not worthy of serious consideration. At the time defendant closed its testimony and rested its case the statute had been in force for at least 16 months, and the result of the rates fixed thereby could have been clearly and accurately shown; yet the company declined to make such a showing, and rested its case on conjecture, assumption and insufficient comparison. We are therefore of opinion that this showing does not meet the burden of proof which the law places upon the defendant.

On the other hand, the plaintiff has shown from the monthly reports made by the defendant company to the Nebraska state railway commission up to and including the month of October of the year 1908 that the reduction complained of has resulted in a large increase of defendant's intrastate business without a corresponding increase of expenses, and has produced a net income amounting to more than 4 per cent. of its gross receipts, exclusive of its money-order business. It also appears that if that item is added to the ordinary earnings of the company, and we agree with the referee that it should

be so added, its profits will be increased to about 5.5 per cent. Surely this is not confiscation, and the rate complained of is at least to a considerable extent remunerative.

It is claimed, however, that the referee has arrived at the foregoing results by an improper method of apportioning expenses to the intrastate business, and this seems to be the main contention between the parties. It appears that the referee has apportioned the expenses on a revenue basis, while the defendant insists that the only correct method of apportionment is the transaction or package basis. The referee has found, from an estimate for the year 1907, based on an actual count for the months of March and September, that there were, for that year, 1,698,752 handlings of domestic, and 1,003,648 handlings of interstate, transactions. In other words, that the handlings of domestic transactions were 62.8 per cent. of all of the handlings within the state. It is now contended by the defendant that the item of terminal cost ought to have been distributed according to the ratio which the domestic handlings bear to the interstate handlings. The referee has found, and this is not contested, that these items aggregate $146,231.91, which, distributed on the basis proposed, would result in charging the domestic business, which produced a revenue of $277,726.-76, with $91,833.36, and the interstate business, which produced a revenue of $655,027.52, with only $54,398.28. This would make the terminal cost of the domestic business 33 per cent. of the revenue derived from it, and the terminal cost of the interstate business would be only 8.3 per cent. of the revenue received therefrom. As was said by the referee: "An apportionment according to this method shows that the defendant carried on its intrastate business in 1907 at a loss of approximately $12,000." This, to say the least, is incredible. The fact, as we have above stated, that the defendant, before the passage of the act in question, had been unrestrained in fixing its rates causes us to doubt the correctness of this method

of apportionment; and, while we do not hold that a fair distribution of expenses cannot be made on the package basis, we are of opinion, for many reasons, that the apportionment of expenses on a revenue basis affords the easiest and most practicable solution of this difficult question.

We also find from the evidence that the defendant has in many ways pursued and offered sanction for this method. Indeed, until this contention arose, it seems to have considered its business throughout the whole country as an entirety, and to have deducted its expenses, and calculated its profits, on the revenue basis. Again, it is a well-known fact that the expense of a particular transaction may not be, and often is not, the same at the point of shipment as at the point of destination. The amount paid by defendant to its agents at its different points for the same handling is not always the same. To illustrate, suppose a shipment originates at an office where the pickup and delivery system is in operation, and terminates at a point where that method is not pursued, but where the consignee is required to visit the express office in order to obtain the consignment. In such a case to double the charge at either point would not produce the correct amount of terminal expense. For further illustration, suppose a package is shipped from an office where the agent receives as his compensation a commission of, say, 10 per cent. of the amount charged for the shipment, while the receiving office is in charge of an agent who receives a salary. In such a case it would be impracticable and incorrect to double the amount of the agent's commission at the shipping office to obtain the amount of terminal expenses of that transaction. It further appears that the largest item, to wit, $66,493.07 commission paid to agents, has no relation at all to the number of pieces handled, but is based entirely upon the revenue derived from the business transacted at their offices. It is also inferable from the evidence that agents' salaries, an item amounting to $8,582, are based to some extent

upon revenue. So we do not see how, upon this record, it can be held, as a matter of law, that terminal expenses must be distributed upon the package basis, and not otherwise. For the foregoing reasons, we are constrained to sustain the finding of the referee which adopts the revenue basis for a distribution of terminal charges.

In concluding the discussion of this question, it must be borne in mind that, where an attempt is made to strike down a rate statute, it is incumbent on the party complaining to make full, fair and complete disclosure. Now, while it appears from a careful reading of the evidence that in many, and perhaps most, things the defendant has made full and fair disclosure, still in some matters it has failed to do so. We find that there is a large sum charged to the intrastate business as expenses of administration. We are told that this includes the salaries of the defendant's general officers. It appears that the company has declined to state the salary of a single one of such officers, and we are wholly without any knowledge as to the amount, much less the reasonableness, of such salaries. Under a showing of this kind the defendant could, without danger of detection, or even adverse criticism, load the Nebraska state business with an expense which would render it so unremunerative as to require us to strike down the act in question. Again, it appears that the defendant is a joint-stock company, and it is fair to presume, in the absence of disclosure and proof to the contrary, that a majority of its stock is held and owned by its officers and directors. In such a case salaries could readily be made so exorbitant, unreasonable and excessive that by charging to the intrastate business a proportionate amount thereof that business would appear to be unremunerative.

Finally, the evidence shows that the amount paid to the Burlington railroad for transportation for the year 1907 was $159,727.76, or 57.5 per cent. of the gross receipts from domestic business. This appears to be a larger percentage than is paid to any other railroad for

like services.  It may be an entirely proper charge, or it may be an unreasonable exaction, and there is no evidence in the record tending to establish either proposition. Counsel for the defendant assert that its contract with the Burlington railroad was the result of competitive bidding.  This may be so, but it is not proved, and, if it were proved, would not establish *per se* the reasonableness of the charge.  The public is entitled to have its commodities carried at fair rates, and cannot be subjected to excessive charges by any arrangement between the railroad and the express company.  If a railroad farms out the express business, it must be on terms that will enable the express carrier to operate at a profit without imposing excessive charges upon its patrons.  Any contract which will not permit this to be done, whether it be the result of competitive bidding or not, is void, in so far as it affects the rights of the public.

For the foregoing reasons, we are of opinion that the defendant has failed to show by competent evidence a fair and full disclosure that the rates in question are confiscatory, and its exceptions upon this point are therefore overruled.

Having sustained the report of the referee as to the main facts of this controversy, we come now to the consideration of his conclusions of law.  It appears that a like question was before the federal supreme court in *Willcox v. Consolidated Gas Co.*, 29 Sup. Ct. Rep. 192, 212 U. S. 19, where it was held that a court of equity ought not to interfere by injunction with state legislation fixing gas rates, before a fair trial has been made of continuing the business under such rates; and the case must be a clear one before the courts should be asked to interfere by injunction with state legislation regulating gas rates in advance of any actual experience of the practical results of such rates.  That case is an instructive one, and many of the questions involved in the case at bar were there litigated and determined adversely to the defendant's contention herein.  Similar questions were

also before that court in *City of Knoxville v. Knoxville Water Co.*, 29 Sup. Ct. Rep. 148, 212 U. S. 1, and it was there said: "The courts should not enjoin the enforcement of a municipal ordinance fixing maximum water rates on the ground that such ordinance is invalid under U. S. constitution, 14th amendment, as confiscatory, unless the confiscation is clearly apparent." The case of *Chicago & G. T. R. Co. v. Wellman*, 143 U. S. 339, was one to test the validity of an act of the legislature of the state of Michigan, fixing a maximum rate of passenger fare. It was contended in that case that the rate was confiscatory. Mr. Justice Brewer delivered the opinion of the court, from which we quote as follows: "Is the validity of a law of this nature dependent upon the opinion of two witnesses, however well qualified to testify? Must court and jury accept their opinions as a finality? Must it be declared, as matter of law, that a reduction of rates necessarily diminishes income? May it not be possible—indeed, does not all experience suggest the probability—that a reduction of rates will increase the amount of business, and, therefore, the earnings? At any rate, must the court assume that it has no such effect, and, ignoring all other considerations, hold, as matter of law, that a reduction of rates necessarily diminishes the earnings? If the validity of such a law in its application to a particular company depends upon a question of fact as to its effect upon the earnings, may not the court properly leave that question to the jury and decline to assume that the effect is as claimed? There can be but one answer to these questions. If the contention be that the legislature has no power in the matter, and that an act fixing rates, however high they may be, is necessarily unconstitutional, it is enough to refer to the long series of cases in this court in which the contrary has been decided." Concluding the opinion, Judge Brewer said: "Surely, before the courts are called upon to adjudge an act of the legislature fixing the maximum passenger rates for railroad companies to be unconstitutional, on the ground

that its enforcement would prevent the stockholders from receiving any dividends on their investments, or the bondholders any interest on their loans, they should be fully advised as to what is done with the receipts and earnings of the company; for, if so advised, it might clearly appear that a prudent and honest management would, within the rates prescribed, secure to the bondholders their interest, and to the stockholders reasonable dividends. While the protection of vested rights of property is a supreme duty of the courts, it has not come to this, that the legislative power rests subservient to the discretion of any railroad corporation which may, by exorbitant and unreasonable salaries, or in some other improper way, transfer its earnings into what it is pleased to call 'operating expenses.'  *  *  *  The silence of the record gives us no information, and we have no knowledge outside thereof, and no suspicion of wrong. Our suggestion is only to indicate how easily courts may be misled into doing grievous wrong to the public, and how careful they should be to not declare legislative acts unconstitutional upon agreed and general statements, and without the fullest disclosure of all material facts."

In the case at bar counsel have devoted a considerable part of their brief to a eulogy of the ability, probity and integrity of their witnesses. By this opinion we do not intend to in any manner reflect upon the character of the officers of the express company, but confine ourselves to the belief that full disclosure has not been made.

We think our decision herein should be ruled by the principles announced in the foregoing cases, rather than by the case of *Cotting v. Kansas City Stock Yards Co.*, 183 U. S. 79, which is cited and relied on by counsel for the defendant. In that case the service was rendered by the owners of property, in such a position that the public had simply an interest in its use, while in the present case the defendant has devoted its property to the discharge of a public service. It should also be remembered that

the judiciary ought not to interfere with the collection of rates established under legislative sanction, unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as, under all the circumstances, is just both to the owner and the public. Judicial interference should never occur, unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property, under the guise of regulation, as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for public use. This state of affairs cannot be said to exist in the case at bar, for it not only appears that the rates fixed by the statute are not confiscatory, but afford defendant a much greater percentage of income on its Nebraska intrastate business than that which, by its own testimony, it claims to receive upon its general business considered as an entirety. For the foregoing reasons, the referee's conclusions of law upon this point are sustained.

Defendant further contends that the act in question is unconstitutional because of the enormous fines which it imposes for a failure to comply with its terms, and it is thereby denied the equal protection of the law. It is a sufficient answer to this contention to say that the act does not in any manner deny the defendant the right to test its validity in the courts; and the reasonableness of the rates fixed thereby are now by this proceeding under judicial inquiry. It also seems clear that the penalty clause is not a necessary or inseparable part of the act, without which it would not have been passed. In such a case if, when the objectionable part of the statute is eliminated, the remainder is valid and capable of being enforced, the valid portion of the act will be upheld. *Willcox v. Consolidated Gas Co., supra.* This is a familiar principle which has been often announced by this court, and we do not hesitate to say that, in order to avoid striking down the act in question, we would, if necessary, elimi-

nate the penalty clause. *Scott v. Flowers,* 61 Neb. 620; *State v. Stuht,* 52 Neb. 209, and cases there cited.

It is also urged by counsel for the defendant that what its property is worth for taxation, or what its business produced for that purpose, must be considered or reckoned with when the inquiry is directed to the amount upon which a legitimate return may be claimed. This question was squarely presented and passed upon in the case of *Willcox v. Consolidated Gas Co., supra,* where it was said: "The assessed value for taxation of the franchises of a gas company furnishes no criterion by which to ascertain their value, when testing the reasonableness of gas rates as fixed by statute, where the taxes are treated by the company as part of its operating expenses, to be paid out of its earnings before the net amount applicable to dividends can be ascertained." And further: "The future assessment of the value of the franchises, it is presumed, will be much lessened if it is seen that the great profits upon which that value was based are largely reduced by legislative action."

Counsel for defendant complain of the failure of the referee to incorporate in his report their theory of the case, which they have designated the ultimate facts, and by motion have asked us to require him to make it a part of his findings. We are of opinion that this request should be denied. The statement so entitled is not in evidence. It is simply a summary of the conclusions of counsel as to what the evidence shows, and is properly made a part of their brief. It was used by them as a part of their oral argument; but, as its conclusions were repudiated by the referee, he properly refused to make it a part of his report.

Finally, upon a careful consideration of the whole case, we are of opinion that defendant's exceptions should be, and they are, overruled; and the report of the referee is sustained. This requires us to enter judgment for the plaintiff, and this we do without hesitation, because we are convinced from the evidence that the rates complained

of are not clearly shown to be confiscatory, but are, to some extent, at least remunerative. When this fact appears the courts should not interfere to strike down the statute, but should require the complainant, if the rates are deemed to be too low, to resort to the rate-making power, or the tribunal charged with rate regulation for relief. The statute in question clearly provides that the express companies, in case the rates fixed thereby are found to be unreasonable, may apply to the Nebraska state railway commission for relief, and that tribunal is given full authority to increase such rates.

For the foregoing reasons, judgment will be rendered for the state, and the temporary restraining order now in force herein is made permanent; but our judgment must be so construed as not to in any manner interfere with the right of the defendant company to apply to the state railway commission for a revision or an increase of rates, if in any case it shall deem them unreasonable; and the power of that tribunal to grant any and all proper relief is not to be affected thereby.

JUDGMENT ACCORDINGLY.

REESE, C. J., and ROSE, J., not sitting.